**In re SACO LOCAL DEVELOPMENT CORP., Leather Comfort Corporation, Kirstein Leather Co. d/b/a Saco Tanning Corp., Kirstein Split Corporation, Debtors.**

**Bankruptcy Nos. 281–00151 through 281–00154.**

United States Bankruptcy Court, D. Maine.

Oct. 1, 1982.

Gregory A. Tselikis, Charles E. Miller, Bernstein, Shur, Sawyer & Nelson, Portland, Me., for trustee.

Peter S. Plumb, Clarke C. Hambley, Murray, Plumb & Murray, Portland, Me., for Northwestern.

## MEMORANDUM DECISION

FREDERICK A. JOHNSON, Bankruptcy Judge.

The debtors filed for relief under chapter 11 of the Bankruptcy Code on March 26, 1981.[1] On May 18, 1981 Northwestern National Life Insurance Company (Northwest) filed a proof of claim in which it asserted its entitlement to a priority under 11 U.S.C. § 507(a)(3) and (4)[2] for earned but uncollected premiums due it on two insurance policies issued to the debtor on January 1, 1979 covering the debtor's employees.[3] On May 20, 1981 the cases were converted to chapter 7 and a trustee was appointed.

The trustee filed an objection to Northwest's proof of claim. At the hearing on the trustee's objection the court accepted into evidence a stipulation designating the dates for which no premiums were paid. Northwest's claim totals $109,576.25 for unpaid premiums for the period from November 1, 1980 to the date of filing, March 26, 1981. It has been stipulated that Northwest's claim for premium payments earned after the date of filing is entitled to priority under 11 U.S.C. § 507(a)(1).

The debtor was for many years engaged in the business of leather tanning at Biddeford and Saco, Maine, employing several hundred hourly workers and management personnel. As a benefit to the employees, the debtor purchased the subject insurance policies. The policies were not the result of a collective bargaining agreement; however, their existence was used in recruiting personnel and was a factor in reducing employee turnover. The employees did not contribute to the premium payments which were made directly by the employer-debtor to the claimant.

The issue is whether or not the claim of Northwest for earned but uncollected health, life and disability insurance premiums due it from the debtor at the time of the filing of the petition is entitled to priority under 11 U.S.C. § 507(a)(4).

The court concludes that the claim is entitled to priority.

## DISCUSSION

Cases decided under the Bankruptcy Act of 1898 are of little or no assistance in resolving this issue. Under the Act priority was extended only to "wages and commissions"; there was no counterpart to Section 507(a)(4). Cases decided under the Act leave no doubt that employee compensation other than wages was not entitled to priority. See *United States v. Embassy Restaurant,* 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1958) and *Board of Electrical Industry v.*

---

1. The cases were consolidated for purposes of administration. Hereinafter debtors will be referred to as a single debtor.

2. The claimant, Northwest, has abandoned its assertion of entitlement to a priority under Section 507(a)(3); it is now proceeding exclusively under Section 507(a)(4).

11 U.S.C. § 507(a)(4) provides:
(a) The following expenses and claims have priority in the following order:

. . . . .

(4) Fourth, allowed unsecured claims for contributions to employee benefit plans—
(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
(B) for each such plan, to the extent of—
(i) the number of employees covered by such plan multiplied by $2,000; less
(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

3. The first policy provided life insurance, accidental death and dismemberment insurance. The second policy provided disability, income and health insurance.

*United States,* 391 U.S. 224, 88 S.Ct. 1491, 20 L.Ed.2d 546 (1968).

The legislative history of 11 U.S.C. § 507(a)(4); however, makes it clear that Congress intended, under Section 507(a)(4), to extend priority status to other forms of employee compensation.

> Paragraph (4) overrules *United States v. Embassy Restaurant,* 359 U.S. 29 (1958), which held that fringe benefits were not entitled to wage priority status. The bill recognizes the realities of labor contract negotiations, where fringe benefits may be substituted for wage demands.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 357 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 69 (1978), *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5855.

Section 507(a)(4) adds to the wage priority by extending priority status to "unsecured claims for contributions to employee benefit plans." Northwest's claim is entitled to a priority under Section 507(a)(4) if the unpaid premium payments fit into this classification. The trustee argues that the premium payments are neither "contributions" nor are they to an "employee benefit plan."

The terms "contribution" and "employee benefit plan" are not defined in the Bankruptcy Code. The trustee argues that the terms should be defined so as to limit the Section 507(a)(4) priority to the *Embassy Restaurant* situation, where the fringe benefit is the result of a collective bargaining agreement.

In an effort to define these terms the court has examined the Employee Retirement Income Security Act of 1974, Title 29 U.S.C. § 1001 et seq. (ERISA). This statute deals primarily with the regulation of employee pensions plans, but it also applies to other forms of employee benefit plans.

The phrase "employee benefit plans" as used in ERISA, of course, need not mean the same thing in the Bankruptcy Code; but the meaning attributed in one statute is far from irrelevant to the interpretation of another. This is especially true where the two statutes have similar policies, such as is the case here. *See Embassy Restaurant,* 359 U.S. 29, 38–40, 79 S.Ct. 554, 559–560, 3 L.Ed.2d 601 (Black, J., dissenting). The policy of Section 507(a)(4) and ERISA is the protection of employee benefits.

The legislative history of Section 507(a)(4) reveals that Congress was aware of the ERISA definition of "employee benefit plans." On Monday, April 12, 1976, representatives of several labor organizations appeared before the House Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary. The Subcommittee was considering H.R. 31 and H.R. 32, which were links in the evolutionary chain leading eventually to the enactment of the 1978 Bankruptcy Code.[4]

These labor leaders urged the Committee to adopt the term "employee benefit plans" as used in ERISA. The statement of Max Zimny, General Counsel of the International Ladies Garment Workers Union is typical:

> We turn now to Paragraph (a)(4). This Paragraph is defective in a number of respects. First, its description of employee benefit plans is too narrow... We therefore urge the committee to adopt the term 'employee benefit plans' which is the same term employed in the Pension Reform Act of 1974. This would permit federal bankruptcy law protection now and in the future of all employee benefit plans... If the loss of a job has not put a worker on the welfare rolls, the loss of health benefits to a stricken worker or members of his or her family would very likely do so....

*Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 2nd Sess. 2424–2425 (1976) (hereinafter cited as Hearings).

The fact that Congress finally adopted the term "employee benefit plan" found in ERISA supports the use of ERISA in interpreting Section 507(a)(4).

---

4. H.R. 31 was drafted by the Commission on the Bankruptcy Laws of the United States; H.R. 32 was drafted by the National Conference of Bankruptcy Judges.

Title 29 U.S.C. § 1002(3) of ERISA defines the term "employee benefit plan" as follows: "The term 'employee benefit plan' or 'plan' means an employee welfare benefit plan..." The term "employee welfare benefit plan" is then defined in 29 U.S.C. § 1002(1):

> The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program which was heretofore or is hereafter *established or maintained by an employer or by an employee organization, or by both,* to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, *through the purchase of insurance or otherwise,* (A) *medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death* or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions). (emphasis supplied).

▮ The debtor's insurance program fits within this definition. It is a program which was established and maintained by an employer, through the purchase of insurance, for the purpose of providing various benefits to its employees, all of which are specifically listed in 29 U.S.C. § 1002(1).

There is no requirement that Section 507(a)(4) should be restricted to only formal, written plans. The debtor's informal plan of providing insurance coverage to its employees is an "employee benefit plan" within the meaning and intent of 11 U.S.C. § 507(a)(4).[5]

▮ Were the premium payments "contributions"? The term "contribution" is not specifically defined; however, 29 U.S.C. § 1002(1) provides that a program is a "plan" if it is, among other criteria, "established or maintained" by the employer. In the present case the plan was established by the employer's purchase of the insurance policies and maintained by the employer's premium payments. These premium payments are "contributions" as that term is used in Section 507(a)(4).

▮ The trustee argues that there should be no extension of priority unless the premium payments are owed as the result of a collective bargaining agreement or the payments are owed to a representative of the employees such as a union trust fund. In essence, this would mean that priority should be extended only where there is an employee union involved. Congress could not have intended such a distinction. Section 507(a)(3), the wage priority statute, provides protection to all employees, and not just to those who are unionized; Section 507(a)(4) should do the same. The fact that the payments are going directly to the insurance company rather than to a union intermediary is a nebulous distinction. The union intermediaries in such cases are simply conduits for payment to the insurance carrier.

The language of Section 507(a)(4) supports this view. Section 507(a)(4) provides a priority for "allowed unsecured *claims* for contributions to employee benefit plans..." (emphasis supplied); it in no way limits such claims to certain types of claimants. The definition of a "claim" in the Bankruptcy Code makes no reference to the nature of the claimant.[6] The focus of Section 507(a)(4) is upon the claim and not the identity of the claimant. "Contributions to

---

**5.** There was never a written contract between the debtor and its employees for the provision of insurance; however, the employees all received detailed brochures on their insurance protection. One such brochure was entitled: "Your Group Insurance Plan."

**6.** 11 U.S.C. § 101(4), which defines a claim, states:

> (4) 'claim' means—
> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; ...

employee benefit plans" are entitled to priority whether they are paid to a union trust fund or directly to an insurer.

The insurance coverage given to the employees of the debtor is a form of indirect compensation. "The employee benefit plans contemplated within the reach of Section 507(a)(4) include health insurance programs, life insurance programs, pension funds, and other 'forms of employee compensation that is [sic] not in the form of wages.'" 3 Collier on Bankruptcy, § 507.04 (15th ed. 1982), at 507–41. In *In re Shearon,* 10 B.R. 626, 7 B.C.D. 746 (Bkrtcy.D.Neb. 1981) the court held that § 507(a)(4) applies to all forms of employee compensation not in the form of wages.

There are policy considerations here, of which Congress must have been aware. The granting of priority status to such claims means that insurance carriers such as Northwest, will not be inclined to quickly cancel the coverage for employees of financially troubled employers. As Max Zimny so aptly put it:

> If the loss of a job has not put a worker on the welfare rolls, the loss of health benefits to a stricken worker or members of his or her family would very likely do so.

Hearings, at 2425.

Northwest's claim is entitled to priority under Section 507(a)(4) for the unpaid premium payments owed by the debtor in that they are for contributions to an employee benefit plan.

Section 507(a)(4) has two additional limitations upon it. First, the claim must arise "from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first..."[7] All of the unpaid premiums are for a period of coverage within 180 days of the filing; thus this limitation will not restrict Northwest's priority claim.

The second limitation restricts the dollar amount of the priority claim.[8] Northwest's

priority claim is limited to the number of employees covered by the two policies multiplied by $2,000. Subtracted from this must be the amount paid to these same employees under the Section 507(a)(3) wage priority and the "amount paid by the estate on behalf of such employees to any other employee benefit plan." Upon the record in this proceeding the court is unable to determine if this limitation will affect the claim of Northwest.

An appropriate order will be entered.

---

7.  11 U.S.C. § 507(a)(4)(A).

8.  *See* 11 U.S.C. § 507(a)(4)(B).