In re EDWARD W. MINTE
COMPANY, INC.,
Debtor.

Edward W. Minte Company,
Inc., Plaintiff,

v.

Franey & Parr, Defendant.

Bankruptcy No. 95–01054.
Adversary No. 97–0081.

United States Bankruptcy Court,
District of Columbia.

Nov. 19, 2002.

Alan M. Grochal, Mary Frances Eber-sole, Tydings & Rosenberg LLP, Balti-more, MD, for Plaintiff.

Nelson C. Cohen, Virginia Whitehill Gul-di, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P., Washington, DC, for Defendant.

*DECISION RE ISSUE OF AN INSUR-ANCE BROKER'S ENTITLEMENT TO § 507(a)(4) PRIORITY PRE-SENTED BY FRANEY & PARR'S MOTION FOR SUMMARY JUDG-MENT*

S. MARTIN TEEL, Jr., Bankruptcy Judge.

This is a proceeding under the Bank-ruptcy Code[1] to recover payments that are allegedly avoidable under § 547(b) as preferences.[2] The defendant, Franey & Parr ("F & P"), has filed a Motion for Summary Judgment ("Motion"). This de-cision addresses why the court concludes that, in determining under § 547(b)(5) what F & P would have received in a liquidation under chapter 7, none of F & P's claims would have been entitled to priority under § 507(a)(4) for obtaining workers' compensation insurance for the debtor.[3]

I

The debtor, Edward W. Minte Company ("Minte"), filed the complaint seeking to avoid alleged preferential payments made to F & P, an insurance broker, in the amount of $51,000.54, made up predomi-nantly of payments to F & P for obtaining workers' compensation insurance coverage for Minte under a policy carried by The Hartford Insurance Group ("Hartford").[4] As one of its defenses, F & P contends that F & P's claims for obtaining workers' compensation insurance coverage, had they not been paid prepetition, would have been paid as § 507(a)(4) priority claims if the debtor's case had been a chapter 7 liquidation case.[5] The court rejects F & P's assertion that the claims would have enjoyed § 507(a)(4) priority for the rea-sons that follow.

II

■ Minte contends that if anyone is entitled to § 507(a)(4) priority, it is Hart-ford, as the provider of the workers' com-pensation insurance, and that under § 507(d), F & P, a subrogee, is precluded from assuming Hartford's priority status. Section 507(d) prohibits a subrogee from stepping into the claimant's priority status:

1. Unless otherwise indicated, section citations are to the Bankruptcy Code (title 11 of the United States Code).

2. Additionally, pursuant to § 502(d) (for fail-ure of F & P to return the alleged preference to the debtor), Count II of the complaint seeks disallowance of any claim of F & P. If there is no recoverable preference, Count II must fail.

3. The court will address by a separate deci-sion the remaining issues presented by the Motion.

4. Although § 547(b) refers to avoidance of transfers by a trustee, Minte, as a debtor-in-possession was vested with the powers of a trustee. *See* § 1107(a). The terms of Minte's confirmed plan vested it with the power to continue pursuit of avoidance actions.

5. One of the elements of avoidance of a trans-fer as a preference is that the transfer was one:

(5) that enables [the] creditor to receive more than such creditor would receive if-
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title[.]
11 U.S.C. § 547(b)(5).

"An entity that is subrogated to the rights of a holder of a claim of a kind specified in subsection ... (a)(4) ... of this section is not subrogated to the right of the holder of such claim to priority under such subsection."

■■■ Subrogation is the well-recognized basis for an insurance agent to recover unpaid premiums from an insured, as recognized by the cases cited in A.G. Barnett, Annotation, *Right of Insurance Agent to Sue in His Own Name for Unpaid Premium*, 90 A.L.R.2d 1291, 1963 WL 13581 (1963). *See In re Int'l Eng'rs, Inc.*, 812 F.2d 78 (2d Cir.1987).[6] F & P was subrogated to Hartford's rights,[7] and has not pointed to evidence or law demonstrating that its rights arose other than by way of subrogation.[8] Accordingly, based

on § 507(d), F & P is not entitled to summary judgment by relying on whatever priority the workers' compensation insurance premium claims, if asserted by Hartford, would have enjoyed under § 507(a)(4).

### III

Even if F & P were claiming by way of a direct contract with Minte or by way of assignment of, instead of subrogation to, Hartford's rights, Minte's argument has led me to question my prior holding in *In re Gerald T. Fenton, Inc.*, 178 B.R. 582 (Bankr.D.D.C.1995), that an insurer is entitled to priority under 11 U.S.C. § 507(a)(4) with respect to furnishing of workers' compensation insurance.[9]

6. In *In re Chateaugay Corp.*, 177 B.R. 176, 183–84 (S.D.N.Y.1995), *aff'd*, 89 F.3d 942 (2d Cir.1996), an insurance company had issued surety bonds securing payment of the debtors' obligations under the workers' compensation laws of various states. The court held that the workers' compensation claims of some of those states were tax claims entitled to priority under what is now § 507(a)(8). When the insurance company paid those claims pursuant to the bonds, it became subrogated to those claims. However, § 507(d) precluded the insurance company from enjoying § 507(a)(8) priority.

7. As a broker, F & P acted as a middleman, obtaining insurance for Minte from Hartford, and collecting premiums on Hartford's behalf. Minte remained principally obligated to make payments of the insurance premiums. F & P was liable to Hartford if Minte failed to make timely payment and F & P failed to notify Hartford of the default to cancel the policy. For the months at issue here, when Minte defaulted in making timely payment of the premiums, F & P advanced premiums on Minte's behalf instead of notifying Hartford to cancel the insurance. By way of subrogation, F & P is entitled to assert Hartford's rights to payment of the premiums.

8. While F & P and Minte may have been free to enter into a contract under which F & P lent moneys to Minte with which to make

premium payments, or Hartford could have assigned F & P its rights, F & P has pointed the court to no such contract or assignment.

To have agreed, explicitly or implicitly, to an assignment requires some volitional act, *Wilson v. Brooks Supermarket, Inc. (In re Missionary Baptist Found.)*, 667 F.2d 1244 (5th Cir. 1982), and there is no evidence of that in this case.

9. Normally this court would not revisit its holding in a prior case when the parties have failed specifically to question its validity. However, Minte's argument that F & P is not within the intended reach of § 507(a)(4), being little more than a lender who facilitated the debtor's obtaining insurance, raised doubts in my mind that *Fenton* was correctly decided, and prompted me to reconsider *Fenton* in light of decisions issued after *Fenton* was decided.

Although Minte failed specifically to argue that neither an insurer (such as Hartford) nor an insurance broker (such as F & P) can ever be entitled to such priority for facilitating workers' compensation coverage, the court is required to determine F & P's motion for summary judgment based on whether F & P "is entitled to a judgment as a matter of law." F.R. Civ. P. 56(c).

In *Fenton*, this court followed *Employers Ins. of Wausau v. Plaid Pantries, Inc.*, 10 F.3d 605 (9th Cir.1993), and held that an insurer may assert § 507(a)(4) priority for unpaid premiums for workers' compensation insurance.[10] Three other courts of appeals have in the interim held to the contrary in what I will refer to as the *Birmingham–Nashville*,[11] *Southern Star*,[12] and *HLM*[13] decisions. Those decisions reject the proposition that furnishing workers' compensation insurance can be an employee benefit plan within the meaning of § 507(a)(4).

■ As those decisions emphasize, and as this court failed to acknowledge in *Fenton*, the priority provisions in the Bankruptcy Code should be narrowly construed. "If one claimant is to be preferred over others, the purpose should be clear from the statute." *Nathanson v. NLRB*, 344 U.S. 25, 29, 73 S.Ct. 80, 97 L.Ed. 23 (1952). *See also United States v. Embassy Restaurant*, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959). Applying that standard, I am convinced that *Fenton* erred.

Section 507(a)(4) presents three preliminary questions in regard to an insurance company's claim for unpaid premiums for workers' compensation insurance:

(1) Is an entity's extension of credit (in whatever form) that simply enabled an employer to make a contribution to an employee benefit plan in the form of insurance coverage a contribution to that plan?

(2) If so, is the employer's provision of such insurance pursuant to compulsory state statutes a "contribution" as that term is used in § 507(a)(4)?

(3) If so, is an employer's provision of workers' compensation insurance a contribution to an employee benefit plan despite it being a substitute for common liability instead of a wage substitute?

The courts of appeals in *Birmingham–Nashville*, *Southern Star*, and *HLM* ducked that first question, but it would have been the logical first question to answer, as it would have rendered the other two questions academic in those cases (and perhaps entirely academic in other cases).[14] Accordingly, I address first

---

**10.** *Fenton* also followed *In re AOV Indus., Inc.*, 85 B.R. 183 (Bankr.D.D.C.1988) (Bostetter, J., sitting by designation). The conclusions of *AOV Industries* regarding § 507(a)(4) were unnecessary dicta because the court was unable to find that other requirements of § 507(a)(4) were met, and granted the insurance company summary judgment as to the preference claims asserted against it on the basis of § 547(c)(2) as ordinary course of business payments.

**11.** *Travelers Prop. Cas. Corp. v. Birmingham–Nashville Express, Inc. (In re Birmingham–Nashville Express, Inc.)*, 224 F.3d 511 (6th Cir.2000), *aff'g* unreported decision (M.D.Tenn.), *aff'g In re Birmingham Nashville Express, Inc.*, 221 B.R. 194 (Bankr.M.D.Tenn. 1998).

**12.** *State Ins. Fund v. Southern Star Foods, Inc. (In re Southern Star Foods, Inc.)*, 144 F.3d 712 (10th Cir.1998), *aff'g State Ins. v. Mather (In re Southern Star Foods, Inc.)*, 210 B.R. 838

(10th Cir. BAP 1997), *aff'g In re Southern Star Foods, Inc.*, 201 B.R. 291 (Bankr.E.D.Okla. 1996), *cert. denied*, 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998).

**13.** *Employers Ins. of Wausau, Inc. v. Ramette (In re HLM Corp.)*, 62 F.3d 224 (8th Cir.1995), *aff'g* 183 B.R. 852 (D.Minn.1994), *aff'g In re HLM Corp.*, 165 B.R. 38 (Bankr.D.Minn.).

**14.** If a debtor in bankruptcy failed to provide workers' compensation insurance, and the employees worked without such coverage, payment for such insurance at a later date would come too late. Such employees would not be able to make a claim for a contribution of insurance that no longer can be obtained. However, if a trust (including a union welfare plan), to which the debtor was required to make its benefit plan contributions, obtained such insurance for the employees when the employer failed to make the necessary contributions, issues (2) and (3) would still be live

whether an insurer or similar entity is ever entitled to make a claim under § 507(a)(4) for unpaid premiums for insurance furnished under an employee benefit plan.

## IV

■ I conclude, despite my prior decision to the contrary in *Fenton*, that insurers (and accordingly insurance brokers such as F & P) are not entitled to a § 507(a)(4) priority for a claim for unpaid insurance premiums even if that insurance was required to be provided as part of an employee benefit plan. The courts of appeals in *Birmingham–Nashville*, *Southern Star*, and *HLM* declined to reach this issue. Other decisions are split on this issue.

The leading decision holding in favor of insurers on this issue is *In re Saco Local Dev. Corp.*, 711 F.2d 441 (1st Cir.1983), *aff'g*, 23 B.R. 644 (Bankr.D.Me.1982).[15] However, I too readily followed *Saco Local Dev. Corp.* in *Fenton*, 178 B.R. at 584, and a growing number of decisions, exemplified by the bankruptcy appellate panel's decision in *Southern Star*, 210 B.R. at 841, have persuasively held against insurers on this issue.[16] The bankruptcy appellate

issues because the trust itself would be an employee benefit plan with standing to make a claim against the employer for its failure to make the contribution. If § 507(a)(4) is limited to such entities, that puts a wholly different light on whether a rare case of such an entity's claim for unpaid contributions for workers' compensation insurance ought to be accorded priority. However, the issue would be academic if union pension plans in practice never collect contributions from the employer for workers' compensation coverage.

15. The reasoning of *Saco* has been followed, usually without any material elaboration thereon, in several decisions. *See Plaid Pantries*, 10 F.3d at 607; *Aetna Life Ins. Co. v. Montaldo Corp. (In re Montaldo Corp.)*, 232 B.R. 853 (M.D.N.C.1997), *rev'g* 207 B.R. 112, 117 (Bankr.M.D.N.C.); *Allegheny Int'l, Inc. v. Metro. Life Ins. Co. (In re Allegheny Int'l, Inc.)*, 138 B.R. 171 (Bankr.W.D.Pa.), *aff'd*, 145 B.R. 820 (W.D.Pa.1992). *See also Official Creditors Comm. v. Blue Cross & Blue Shield of Ga., Inc. (In re Lummus Indus., Inc.)*, 193 B.R. 615 (Bankr.M.D.Ga.1996) (administrator of a health plan that had paid employees' health claims under debtor's self-funded plan could assert § 507(a)(4) priority); *Official Labor Creditors Comm. v. Jet Fla. Sys., Inc. (In re Jet Fla. Sys., Inc.)*, 80 B.R. 544 (S.D.Fla.1987) (discussing *Saco* favorably in dictum in holding that employees of self-insured debtor may claim priority for accrued medical expenses that were to be paid under self-insurance plan); *In re Braniff, Inc.*, 218 B.R. 628, 631–32 (Bankr.M.D.Fla.1998) (district court followed *Jet Florida* in holding that insurer's claims for reimbursement of its payments of

employee health claims "should be considered contributions to an employee benefit plan", and on remand bankruptcy court followed *Fenton* in holding that a claim for unpaid premiums arises from services rendered as required by § 507(a)(4)); *In re Cardinal Indus., Inc.*, 164 B.R. 76, 78 (Bankr. S.D.Ohio 1993) (priority of claims for reimbursement of insurance company for employee claims paid under employer's self-insured plan was undisputed, but the court cited *Saco* favorably in ruling that the insurer's fees for administering the plan were also entitled to § 507(a)(4) priority).

16. *See Birmingham Nashville*, 221 B.R. at 198 (bankruptcy court's decision); *Mfrs. Alliance Ins. Co. v. Satriale (In re Allentown Moving & Storage, Inc.)*, 214 B.R. 761, 766–67 (E.D.Pa. 1997), *aff'g In re Allentown Moving & Storage, Inc.*, 208 B.R. 835 (Bankr.E.D.Pa.); *In re Montaldo Corp.*, 207 B.R. 112, 117 (Bankr. M.D.N.C.), *rev'd*, 232 B.R. 853 (M.D.N.C. 1997); *In re AER–Aerotron, Inc.*, 182 B.R. 725, 727–28 (Bankr.E.D.N.C.1995); *HLM*, 165 B.R. at 41–42 ("Section 507(a)(4) is not to assure the insurance industry that insurers will be paid their money.") (bankruptcy court's decision); *In re Arrow Carrier Corp.*, 154 B.R. 642, 646 (Bankr.D.N.J.1993). *See also In re Miller Block Co., Inc.*, 63 B.R. 99, 102 (Bankr.W.D.Pa.1986) ("Section 507(a)(4)(A) only allows a priority for prepetition *delinquent contributions*, for services rendered by the employee within 180 days prior to filing." [Emphasis in original.]). *Cf. In re Mel–Hart Prods., Inc.*, 156 B.R. 606, 607–608 (Bankr.E.D.Ark.1993) (entity that provided

panel in *Southern Star*, 210 B.R. at 841 reasoned:

> [I]nsurance premiums do not arise from "services rendered" by employees as required under § 507(a)(4). The rendering of services by employees results in obligations to them, not to the insurer. *Montaldo* [*In re Montaldo*, 207 B.R. 112 (Bankr.M.D.N.C.1997)] at 114. The claim for unpaid premiums does not arise from "services rendered" but from Southern Star's failure to pay its insurer. This makes it indistinguishable from a typical unsecured claim. *AER–Aerotron, Inc.* [*In re AER–Aerotron, Inc.*, 182 B.R. 725 (Bankr.E.D.N.C.1995)] at 727; *HLM*, 165 B.R. at 41.
>
> . . . Allowing priority status for workers' compensation insurance premiums would shift the recipient of priority status from the debtor's employees to the insurance carrier, which is not what Congress intended in § 507(a)(4).

The § 507(a)(4) priority would apply to contributions to an employee benefit plan that are made by both employees and by employers. The statute does not, however, provide a priority to third parties. Furthermore, even if a third party were to be subrogated to an employee's claim under § 507(a)(4), that claim would be denied priority pursuant to § 507(d). *AER–Aerotron*, 182 B.R. at 727. The reference in § 507(a)(4) to "services rendered" makes clear that Congress intended a debtor's employees,

not third party workers' compensation funds or insurance carriers, to be the recipients of fourth priority status. *Montaldo*, 207 B.R. at 114 ("The rendering of services by employees results in obligations to the employees and not to an insurer."). Southern Star's employees do not have a claim against Southern Star for the unpaid premiums. Allowing the Fund to have priority under § 507(a)(4), a priority intended to benefit employees, is tantamount to subrogating the Fund to the priority of the employees, which is impermissible under § 507(d). [Footnote omitted.] *Montaldo*, 207 B.R. at 117.

Significantly, the statutory cap on the priority described in § 507(a)(4)(B) refers to the wage priority in (a)(3) as a part of the cap's calculation. If insurance premium amounts were intended to be similarly capped, it would not be tied to the amount that employees may collect under the wage priority. *AER–Aerotron*, 182 B.R. at 727.

I largely agree with the bankruptcy panel's reasoning, but will elaborate.[17]

A. *Employees and Employee Benefit Plans as the Intended Beneficiaries of § 507(a)(4).*

The legislative history of § 507(a)(4) reveals that it was intended to protect employees or administrators of employee benefit plans representing their interests:

> § 507(a) deals with are claims against the debtor, not its employees. Necessarily, in an employer's bankruptcy case, § 507(a)(4) deals with claims for contributions the employer was required to make. If the bankruptcy appellate panel had in mind a claim for contributions withheld from employees' wages that the employer failed to turn over to the employee benefit plan, such a claim would be one against the employer for the contribution.

---

employees to employer and paid their benefit claims had contractual claim, not a § 507(a)(4) claim).

**17.** I assume that the bankruptcy appellate panel's reference to § 507(a)(4) priority applying to contributions to an employee benefit plan that are made by employees must refer to contributions withheld by an employer from employees' wages that the employer failed to turn over to the employee benefit plan. I so assume because the claims that

Paragraph (4) overrules *United States v. Embassy Restaurant,* 359 U.S. 29[, 79 S.Ct. 554, 3 L.Ed.2d 601] (1958)[(1959)], which held that fringe benefits were not entitled to wage priority status. The bill recognizes the realities of labor contract negotiations, under which wage demands are often reduced if adequate fringe benefits are substituted. The priority granted is limited to claims for contributions to employee benefit plans such as pension plans, health or life insurance plans, and others, arising from services rendered after the earlier of one year before the bankruptcy case and the date of cessation of the debtor's business.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 357 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5963, 6313; S.Rep. No. 989, 95th Cong.2d Sess. 69 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5787, 5855.

Congress thus clearly intended that a welfare benefit plan administrator to whom an employer is required to make contributions may make a claim against the debtor for unpaid contributions, even if the plan administrator provided benefits to the employees despite the debtor-employer's failure to make contributions. The plan benefits illustratively may include purchasing health and life insurance coverage for employees. However, unlike an insurance company that finances payments of premiums and has a claim for the unpaid premiums, the administrator's rights emanate from the services of the employees, and the employees' right (or the administrator's right in their stead) to have the employer contribute to the plan. That right to a contribution exists both before and after the administrator dips into plan funds (or obtains credit) to provide insurance coverage for the employees. The plan administrator's claim against the employer is as a representative of the employees for the contribution to the plan,

not for the plan administrator's having obtained insurance coverage for the employees.

That distinguishes a plan administrator from an insurance company which does not serve as a representative of the employees under an employee benefit plan, and accordingly has no right to demand that contributions be made, either before or after extending insurance coverage on credit.

A plan administrator acts as a representative of the plan established for the employees' benefit, whereas an insurance company merely provides insurance coverage without holding any special relationship to the employees (unless the employees have entered into an arrangement for the insurance company to act as a plan administrator on their behalf).

B. *The Meaning of the Term "Services Rendered."*

■ An insurer's claim for unpaid premiums for having provided insurance coverage (that an employer was required to provide under an employee benefit plan) does not constitute a claim arising from "services rendered" within the meaning of § 507(a)(4). In *Fenton,* 178 B.R. at 589–90, this court concluded that the provision of insurance is a service, and that a claim for unpaid premiums for the provision of such insurance does "arise from services rendered" as that phrase is used in § 507(a)(4). However, bearing in mind that the priority provisions must be narrowly construed, and for the reasons that follow, I am now persuaded that the term "services rendered" in § 507(a)(4) is limited to services rendered by employees, not services rendered by a third party.

First, for a claim to come within § 507(a)(4), the claim must be both a claim "for contributions" and "aris[e] from ser-

vices rendered" within the prescribed statutory period. So for § 507(a)(4) to apply to an insurer's claim for unpaid insurance premiums, the providing of the insurance must both be a "contribution" and arise from services rendered. If the term "services" includes the provision of insurance, this means that the insurer would be claiming priority for a "claim for [insurance coverage provided] to an employee benefit plan ... arising from [insurance coverage provided]." This is double talk. The services § 507(a)(4) has in mind are the services of employees (a construction that eliminates such double talk).

Second, the basic idea of an employee benefit plan suggests that the term "services rendered" means services of employees, not of third parties. Contributions to an employee benefit plan are, of course, based on employment of individuals. Those individuals are employed to render services to the employer. Contributions are based on those services rendered by employees, not by some third party whose services do not increase or decrease the contributions required to be made for the benefit of employees to the employee benefit plan. *Cf. In re Pittston Stevedoring Corp.*, 40 B.R. 424, 426 (Bankr.S.D.N.Y. 1984) ("the event which triggers priority status for a claim for contribution to an employee benefit plan is the performance of that employee's services and not the discovery of the claim for such contribution.").

 Finally, § 507(a)(4) priority is reduced by employees' recoveries under § 507(a)(3).[18] Accordingly, § 507(a)(4) must be read in conjunction with § 507(a)(3), which addresses certain claims of employees for services rendered, specifically, claims for:

> allowed unsecured claims, but only to the extent of $4,000 for each individual ... earned within 90 days before the date of the filing of the petition, or the date of the cessation of the debtor's business, whichever occurs first, for—
>
> > (A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual[.]

Sections 507(a)(3)(A) and 507(a)(4) bear striking similarity in structure and phrasing, and are plainly meant to work together in addressing claims arising from services rendered by employees, not services rendered by third parties.[19] By providing for a reduction of § 507(a)(4) priority by the amount of § 507(a)(3) claims paid for wages, salaries, and commissions arising, of course, from employees' services rendered, and by simultaneously limiting § 507(a)(4) priority to claims for contributions to an employee benefit plan "arising from services rendered," it may be reasonably inferred that the term "services rendered" in § 507(a)(4) refers to services by employees.

Accordingly, the phrase "services rendered" in § 507(a)(4) means the services of employees, not services of an insurer or insurance broker.

18. Under § 507(a)(4)(B), priority for a claim for contribution to an employee benefit plan is limited to:
 (i) the number of employees covered by each such plan multiplied by $4,000; less
 (ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregated amount paid by the estate on behalf of such employees to any other employee benefit plan.

19. Section 507(a)(3) employee claims are clearly claims for compensation for employee services rendered even though the words "services rendered" are not expressly used in § 507(a)(3)(A). *See* § 503(b)(1)(A) (addressing administrative claims for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for **services rendered** after the commencement of the case" (emphasis added)).

C. *Furnishing Insurance Coverage, Not Employees' Services, as the Proximate Cause From Which an Insurer's Claim for Unpaid Insurance Premiums Arises.*

With the phrase "services rendered" in § 507(a)(4) being limited to services of employees, it readily follows that claims by insurers for unpaid insurance premiums, even if those premiums were for insurance coverage under an employee benefit plan, are not entitled to § 507(a)(4) priority. Such claims proximately arise from providing the insurance coverage, not from the provision of employees' services. The insurer is nothing more than a vendor whose sale of insurance on credit facilitates the employer's making the required contribution, and the claim arises from selling insurance on credit, not from the services of employees. "The rendering of services by employees results in obligations to the employees and not to an insurer." *Montaldo,* 207 B.R. at 114; *cf. In re Buf–Air Freight, Inc.,* 174 B.R. 184, 185–86 (Bankr. W.D.N.Y.1994) (not all claims that are measured by prior activities "arise from" those activities for purposes of pension fund withdrawal liability claim under 29 U.S.C. § 1381).

In this regard, an insurer is no different than any other trade creditor whose extension of credit enables the employer to furnish a benefit under an employee benefit plan. *See AER–Aerotron,* 182 B.R. at 727 (discussing hypothetical of a general contractor's claim for constructing breakroom for employees required under employee benefit plan). Once the insurance coverage is provided by the insurer via an extension of credit, the required contribution has been made, and there no longer is a claim for a contribution to the employee benefit plan arising from services of the employees. Instead, a claim has arisen from the insurer's selling insurance coverage to the employer on credit, and the claim is for having facilitated the employer's making the required contribution, not itself a claim for a contribution. *See Montaldo,* 207 B.R. at 114 ("the words 'premium' and 'contribution' are not synonymous"). Once the insurance has already been provided by a third party without charge to the employees or their representative plan, they are not in need of § 507(a)(4) priority. As observed in *Manufacturers Alliance Ins. Co. v. Satriale (In re Allentown Moving & Storage Inc.),* 214 B.R. 761, 766–67 (E.D.Pa.1997):

> [A]ny potential derivative benefit to the employees from their employers' workers compensation insurance arrangement had already accrued at the time that [the insurer] filed its § 507(a)(4) priority claim. Accordingly, to grant priority status to [the insurer's] claim at this time would only serve to benefit [the insurer]. This is clearly not the type of benefit that Congress intended to protect by enacting § 507(a)(4). [Footnote omitted.]

D. *Construing § 507(a)(4) so That Employees (or Their Benefit Plans) do not Compete With Insurers for the Limited Dollar Amounts of Priority Available.*

According § 507(a)(4) priority to an insurer for unpaid insurance premiums would dilute the priority that employees (or their benefit plans) were intended to enjoy under § 507(a)(4). Employees and their benefit plan administrators may have been totally ignorant of a third party's having extended credit to facilitate the debtor's making past contributions to the benefit plan. They may have held off pursuing claims for unpaid contributions because they looked to § 507(a)(4) priority in bankruptcy as giving them protection. Congress did not likely expect employees to compete with insurers in pursuing the

limited dollar amount of priority that can be accorded for contributions to an employee benefit plan.

In *Embassy Restaurant,* the Court based its ruling in part on its concern that if unpaid contributions to an employee benefit plan shared the same priority as wages, "the workman will have to share with the welfare plan, thus reducing his own recovery." 359 U.S. at 34, 79 S.Ct. 554. Although Congress enacted § 507(a)(4) to accord a new priority, next in line after employees' wage priority claims under § 507(a)(3), for the claims of employee benefit plans (or of employees directly) for unpaid contributions to such plans, according insurers priority under § 507(a)(4) results in a vice similar to that perceived in *Embassy Restaurant:* the employees and their employee benefit plans will be required to share with insurers, insurance brokers, and lenders, thus potentially reducing their own recovery under § 507(a)(4).[20]

A third party's claim for facilitating the employer's making contributions to the employee benefit plan is different than a claim for the contributions themselves. For example, a bank might advance funds to an employer in the form of a certified check made payable to an insurer for premiums for group health insurance provided under an employee benefit plan. There is no evidence in the legislative history that Congress intended to accord § 507(a)(4) priority to a creditor for having extended credit to the debtor in order to facilitate the debtor's making such contributions, even where the extension of credit is earmarked for the contributions, and thereby to dilute employees' § 507(a)(4) priority claims.

### E. Unpersuasiveness of Saco Local Dev. Corp.

In light of the foregoing analysis, I find unpersuasive the reasoning, of both the bankruptcy court and the court of appeals, in *Saco Local Dev. Corp.,* that accorded § 507(a)(4) priority to an insurer.

In *Saco Local Dev. Corp.,* the bankruptcy court held that insurance premium payments for insurance provided under an employee benefit plan constitute a "contribution" and that the insurance company's claim for unpaid insurance premiums constituted a claim for contributions within the intent of § 507(a)(4). The trustee urged that the payments must be owed to a representative of the employees. The bankruptcy court rejected the trustee's argument, reasoning that:

> ... The fact that the payments are going directly to the insurance company rather than to a union intermediary is a nebulous distinction. The union intermediaries in such cases are simply conduits for payment to the insurance carrier.

> The language of Section 507(a)(4) supports this view. Section 507(a)(4) provides a priority for "allowed unsecured

20. Although the legislative history to § 507(a)(4) indicates that § 507(a)(4) overrules *Embassy Restaurant,* that is an overstatement because wages are accorded a higher priority under § 507(a)(3) than are contributions to an employee benefit plan under § 507(a)(4). *See West Winds, Inc. v. M.V. Resolute,* 720 F.2d 1097, 1100 (9th Cir.1983), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984) ("Although the Bankruptcy Reform Act changed the priority afforded to claimants like those in *Embassy,* Congress did not 'overrule' *Embassy* or even reject its reasoning."). *Embassy Restaurant* remains valid with respect to its concern that employees ought not have to compete with third parties in the assertion of a priority that is subject to a statutory dollar cap (or for which the funds of the estate may be insufficient to make full payment) and that was intended to protect the employees in the bankruptcy case.

*claims* for contributions to employee benefit plans . . ." (emphasis supplied [in the decision] ); it in no way limits such claims to certain types of claimants. . . . "Contributions to employee benefit plans" are entitled to priority whether they are paid to a union trust fund or directly to an insurer. . . .

. . . The granting of priority status to such claims means that insurance carriers . . . will not be inclined to quickly cancel the coverage for employees of financially troubled employers.

*Saco Local Dev. Corp.*, 23 B.R. at 647–48. The bankruptcy court in *Saco Local Dev. Corp.* first viewed a payment to an insurance company as being a contribution to an employee benefit plan. So far, so good: providing insurance coverage by making payment to the insurance company can be a contribution to an employee benefit plan. The bankruptcy court then reasoned that an insurance company's claim for a debtor's failure to make such payment, in exchange for the insurance company already having furnished the insurance coverage required by the contribution plan, is itself a claim for a contribution to an employee benefit plan. That reasoning is faulty.

First, a § 507(a)(4) claim must arise from services rendered by employees, and such a claim is held by the employees or by a representative of the employees.

Second, prior to extending credit, the insurer has no claim for a contribution, and once credit is extended, the insurer has satisfied the employer's obligation to its employees (or to the employees' representative). No claim for a contribution continues to exist.

Finally, the insurer, no better than a bank that lent money to facilitate the purchase of the insurance, has only a claim for extending credit to facilitate the obtaining of insurance coverage. The insurer **is** different from an employee benefit plan ad-

ministrator because that administrator acts as a representative of the employees and holds the claim for the amount the employer is required to contribute towards the purchase of insurance (even if the administrator has already dipped into its own funds or credit to procure the insurance).

On a direct appeal from the bankruptcy court in *Saco Local Dev. Corp.*, the court of appeals affirmed, reasoning:

To allow the insurer to obtain its premiums through the priority would seem the surest way to provide the employees with the policy benefits to which they are entitled. In principle, as the trustee suggests, the employees might be required to obtain the premiums themselves and pay them over to the insurer if they so chose; in practice, however, this would simply require a more complicated administrative path to the same result. The employees cannot be harmed by the insurance company's right to assert the § 507(a)(4) priority, for the priority is expressly subordinated to the § 507(a)(3) wage priority.

*Saco Local Dev. Corp.*, 711 F.2d at 449. The court of appeals' reasoning that according an insurance company § 507(a)(4) priority cannot harm employees is flatly wrong. There will be cases in which the employees' § 507(a)(4) claims will receive a lesser payment if insurers are allowed a § 507(a)(4) priority for extending credit to the debtor. To paraphrase *Embassy Restaurant*, 359 U.S. at 34, 79 S.Ct. 554, "the workman will have to share with the [insurer], thus reducing his own recovery."

Moreover, the court of appeals disregarded the fact that the employer had already made the contribution (insurance had been provided), and the employees would not have a claim respecting the provision of such insurance. Accordingly, they would not make a § 507(a)(4) recov-

ery that they could then turn over to the insurance company. If the insurer had been acting as a representative of the employees or an employee benefit plan, then the decision might make sense, but the insurer acted only pursuant to an insurance contract with the employer. The employer itself was administering the plan of providing insurance for the benefit of the employees. Once the employer obtained insurance coverage on credit from the insurer, it had made the contribution, and no claim for that contribution existed.

In conclusion, I decline to follow *Saco Local Dev. Corp.*, and hold that "claims for contributions to an employee benefit plan . . . arising from services rendered" under § 507(a)(4) are in any event limited to claims (by employees, or the administrators of employee benefit plans representing their interests) for failure of the debtor to make required contributions (arising from services rendered by employees), not claims of third parties for having facilitated the debtor's making contributions.

## V

▆▆ Even if § 507(a)(4) applies to claims by insurance companies for unpaid insurance premiums for an employee benefit plan, an initial inquiry is whether the payments here can be considered a "contribution." I do not find this inquiry to be dispositive even though *Birmingham–Nashville* appears to have held in part II (224 F.3d at 514–16) that unpaid premiums for workers' compensation insurance do

not constitute a "contribution" under § 507(a)(4). The court of appeals reasoned that because the word "contribute" primarily means to give "along with others":

> the term "contribution" does not describe a unilateral purchase of some product or service. . . . [T]he workers' compensation insurance [the insurance company] sold was paid for solely by [the employer] as required by Tennessee law and, therefore, [the employer's] employees made no "contribution."

*Birmingham–Nashville*, 224 F.3d at 515. Section 507(a)(4) does not refer to contributions by employees, but rather to contributions to an "employee benefit plan." The court of appeals' holding muddled the issue of what is a "contribution" with the more critical issue of what constitutes an "employee benefit plan": only those contributions made to an employee benefit plan qualify for § 507(a)(4) treatment. Indeed, the court of appeals went on seemingly to contradict itself by observing that not every payment made under statutorily mandated coverage for employees fails to qualify as a "contribution":

> An employer's statutorily mandated payment to an employee benefit fund, for example, is no less of a "contribution" to such a fund simply because it is mandated by statute, agency regulations, an employee contract, or a collective bargaining agreement.

*Birmingham–Nashville*, 224 F.3d at 516.[21] Imagine, for example, payments made un-

21. *See also In re Braniff, Inc.*, 218 B.R. 628, 635 (Bankr.M.D.Fla.1998):
[T]he court has difficulty accepting the reasoning of the authorities to the effect that government mandated programs are not benefits to employees because they are not bargained for in lieu of compensation. Clearly, they are benefits to the employees for which the employer must pay. In addition, although they may not be bargained

for, that is only because the government has made them mandatory before any bargaining begins. The government's mandate, however, neither detracts from the benefit these programs bring to employees nor undermines their characterization as compensation. "Compensation" is defined as "something that constitutes an equivalent or recompenses" and "payment to an unemployed or injured worker or his depen-

der a state statute requiring employers to provide life insurance to employees, a clear fringe benefit expressly mentioned in the legislative history to § 507(a)(4).

Perhaps the court of appeals had in mind that a contribution could exist pursuant to a statute mandating insurance coverage only if the payments are provided at the direct expense of the employees (via deductions from their paychecks), but I fail to see how statutorily mandated purchases of, say, life insurance for which only the employer was responsible under state law (without any deduction from employees' wages) would be any less of a fringe benefit. *See In re Saco Local Dev. Corp.*, 711 F.2d 441, 448 (1st Cir.1983) (employer's unilateral purchase of various insurance for employees was a contribution because employees effectively accepted lower wages in exchange for the purchases although there was no express acknowledgment by the employees in that regard).

Perhaps the court of appeals in *Birmingham–Nashville* instead had in mind that workers' compensation insurance coverage, unlike life insurance, is not ordinarily thought of as something that employees might find it desirable to purchase if the employer did not purchase it, thus making the purchase a wholly unilateral exercise, and in that sense there was no "contribution" because the employer cannot be viewed as having contributed for the benefit of the employees in exchange for lower wages. However, that type of reasoning really goes to the different issue of whether the statutory scheme of workers' compensation coverage qualifies as an "employee benefit plan," not whether premiums constitute a "contribution" to that scheme. An employer who makes payments of workers' compensation insurance "contributes" to that scheme, along with other employers who spread the risk of

having to pay for job-related injuries, just as an employer contributes to statutory schemes for unemployment insurance funds. The contribution, however, is for the direct benefit of the employer, not directly for the benefit of employees, and accordingly the critical issue is not whether there was a contribution but whether such a contribution for the direct benefit of the employer is a contribution to an employee benefit plan.

In conclusion, I cannot conclude that a claim based on an employer's obligation to pay workers' compensation insurance premiums fails as a claim for "contributions." I turn to the distinct issue of whether claims for contributions in the form of furnishing workers' compensation insurance are contributions to "an employee benefit plan."

VI

This leaves the remaining issue of whether workers compensation insurance can be a part of an employee benefit plan. As is so often the case in applying a statutory term whose meaning is not clear-cut, the issue of whether a claim based on an employer's obligation to provide coverage for workers' compensation claims constitutes "an employee benefit plan" under § 507(a)(4) is one of degree, and a close call. The Supreme Court has held, since *Fenton* was decided, that for purposes of defining terms in the Bankruptcy Code, it is inappropriate to incorporate characterizations of a term in another statute absent some congressional indication that this was intended. *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 225, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996) (finding, for purposes of classifying a claim imposed by the Internal Revenue Code as an excise tax or a penalty, "no

dents.'' Webster's Ninth Collegiate Dictionary at 268 (Merriam–Webster Inc. 1988).

congressional intent to reject generally the interpretive principle that characterizations in the Internal Revenue Code are not dispositive in the bankruptcy context").[22] *Fenton* erred by applying ERISA's definition of "employee benefit plan" in interpreting § 507(a)(4), thereby giving § 507(a)(4) an expansive instead of a narrow reading. Indeed, as observed by the district court in *HLM,* 183 B.R. at 854 n. 2, ERISA excludes workers' compensation insurance from its coverage even if the ERISA definition of employee benefit plan could be read as broad enough to include workers' compensation insurance schemes.[23]

Workers' compensation insurance statutes confer an indirect benefit on employees, but it is not a wage substitute, like health or life insurance that an employee would otherwise have to purchase out of the employee's own pocket, and in exchange for which employees are encouraged to take lower wages. This follows from the character of workers' compensation. Statutory workers' compensation schemes, such as those to which Minte was subject, displace common law rules of recovery for on-the-job injuries suffered by employees (albeit generally expanding the instances in which recovery is possible, while generally altering the method and amount of recovery). *See Southern Star,* 210 B.R. at 844. A workers' compensation claim is no more a wage substitute than would be a common law claim for on-the-job injuries, or would be an employer's expenses of complying with statutes requiring the employer to provide a safe work environment or adequate restrooms, even though those expenses benefit employees. As observed in *Birmingham–Nashville,* 224 F.3d at 517, "Workers' compensation is not a wage substitute; rather, it is an award arising out of a work-related injury owed by an employer." It is not so much a non-wage form of compensation in lieu of wages as a scheme for how the employer should pay for on-the-job injuries for which the legislature has determined that it should bear responsibility. Such premiums "were primarily for [the employer's] benefit, not its employees." *Southern Star,* 144 F.3d at 716, *quoting Southern Star,* 210 B.R. at 843. Workers' compensation insurance generally cannot be thought of as being designed as an employee benefit in lieu of wages.

Not all of Minte's workers' compensation insurance appears to have been man-

---

**22.** Coincidentally, the Internal Revenue Code provision involved in *CF & I Fabricators* was enacted by the Employee Retirement Income Security Act of 1974, 88 Stat. 935 ("ERISA"), the very statute this court borrowed from in *Fenton* in interpreting § 507(a)(4).

**23.** 29 U.S.C. § 1002(3) provides that an "employee benefit plan" means an "employee welfare benefit plan. . . ." 29 U.S.C. § 1002(1) then provides:

(1) The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

However, 29 U.S.C. § 1003(b)(3) excludes from the statute's coverage any such plan if "such plan is maintained solely for the purposes of complying with applicable workmen's compensation or disability insurance plans."

**16**

dated by state law. Minte's workers' compensation policies here included premiums for workers' compensation insurance for employees for whom such coverage was not required by state law. However, F & P has adduced no evidence to demonstrate that such coverage was bargained for by the employees or their unions (or otherwise looked to by them as a fringe benefit) instead of being a unilateral decision by Minte. Accordingly, the court cannot conclude on this motion for summary judgment that any of F & P's claims for unpaid workers' compensation insurance premiums constitute a claim for contributions to "an employee benefit plan" accorded priority by § 507(a)(4).

## VII

Based on the foregoing, the court determines that F & P has not shown that it has a defense on the basis that its claims for obtaining workers' compensation insurance would have been entitled to § 507(a)(4) priority.