Reversed by Supreme Court, June 15, 2006

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

In Re: HOWARD DELIVERY SERVICE,
INCORPORATED,

*Debtor.*

---

HOWARD DELIVERY SERVICE,
INCORPORATED,

*Debtor-Appellee,*

v.

ZURICH AMERICAN INSURANCE
COMPANY,

*Movant-Appellant.*

No. 04-1136

---

AMERICAN HOME ASSURANCE
COMPANY; HARTFORD FIRE INSURANCE
COMPANY; THE TRAVELERS INDEMNITY
COMPANY,

*Amici Supporting Appellant.*

Appeal from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
Frederick P. Stamp, Jr., District Judge.
(CA-03-61-3; BK-02-30289)

Argued: October 28, 2004

Decided: March 24, 2005

Before NIEMEYER, KING, and SHEDD, Circuit Judges.

Reversed and remanded by published per curiam opinion. Judge King wrote an opinion concurring in the judgment, Judge Shedd wrote an opinion concurring in the judgment, and Judge Niemeyer wrote an opinion dissenting from the judgment.

## COUNSEL

**ARGUED:** Margaret Mary Anderson, LORD, BISSELL & BROOK, Chicago, Illinois, for Appellant. Richard McMaster Francis, BOWLES, RICE, MCDAVID, GRAFF & LOVE, P.L.L.C., Charleston, West Virginia, for Appellee. G. Eric Brunstad, Jr., BINGHAM MCCUTCHEN, L.L.P., for Amici Supporting Appellant. **ON BRIEF:** Hugh S. Balsam, Timothy S. McFadden, LORD, BISSELL & BROOK, Chicago, Illinois, for Appellant. Heather G. Harlan, BOWLES, RICE, MCDAVID, GRAFF & LOVE, P.L.L.C., Charleston, West Virginia, for Appellee.

## OPINION

PER CURIAM:

This appeal presents the question of whether the claim made by Zurich American Insurance Company against the estate of the debtor, Howard Delivery Service, Inc., for unpaid workers' compensation insurance premiums is to be given priority by reason of § 507(a)(4) of the Bankruptcy Code.

The court holds that Zurich's claim is entitled to priority under § 507(a)(4) and therefore reverses the decision of the district court and remands the case for such further proceedings as may be appropriate.

*REVERSED AND REMANDED*

KING, Circuit Judge, concurring in the judgment:

In this appeal by Zurich American Insurance Company ("Zurich"), we are called upon to decide whether a claim by Zurich for unpaid

workers' compensation insurance premiums is entitled to priority status under § 507(a)(4) of the Bankruptcy Code. Zurich maintains that its claim is so entitled, asserting that such premiums constitute, under the applicable statutory provision, "contributions to an employee benefit plan arising from services rendered." 11 U.S.C. § 507(a)(4). Both the bankruptcy court and the district court disagreed with Zurich, relegating its claim to the status of a general unsecured creditor of the bankrupt Howard Delivery Service, Inc. ("Howard"). As explained below, I conclude, on this question of first impression, that Zurich's claim is entitled to § 507(a)(4) priority status.

I.

Under West Virginia law, employers in the state are required to "subscribe to and pay premium taxes into the [state's] workers' compensation fund for the protection of their employees." W. Va. Code § 23-2-1(a). In the alternative, an employer may self-insure by, among other requirements, demonstrating its financial ability to cover any workers' compensation claims that may arise. *Id.* at § 23-2-9. Howard, an over-the-road freight carrier operating in West Virginia, fulfilled its obligations under West Virginia law to become "self-insured" and purchased workers' compensation insurance coverage from Zurich (the "Policy").[1] The Policy became effective on July 1, 1997, and remained in effect until January 22, 2002, when it was cancelled by Howard. Upon cancellation, Howard owed Zurich thousands of dollars in unpaid premiums for coverage afforded by the Policy.[2]

On January 30, 2002, Howard filed a Chapter 11 bankruptcy petition in the bankruptcy court for the Northern District of West Virginia, seeking court protection in the reorganization of its business operations. On May 9, 2002, Zurich filed an unliquidated and unse-

---

[1]Although not relevant to this appeal, Howard also purchased employer's liability and automobile liability policies from Zurich.

[2]The Policy provided coverage to Howard on a "claims incurred" basis; that is, claims incurred while the Policy was in effect were covered, regardless of when such claims might be made. The Policy was a high-deductible insurance plan, requiring Howard to reimburse Zurich for all losses up to $250,000.

cured creditor's claim in that proceeding, seeking priority status from the bankruptcy court for its claim for the unpaid premiums owed on the Policy.[3] On March 28, 2003, Zurich filed an amended proof of claim, specifically asserting that its claim was entitled to priority status under § 507(a)(4) of the Bankruptcy Code (the "Statute"), for contributions to an employee benefit plan in the sum of $410,215 (the "Zurich Claim").[4] Pursuant to the Statute, a creditor of a Chapter 11 debtor is authorized to recover on a fourth-level priority basis as follows:

  (a)   The following expenses and claims have priority in the following order:

        . . . .

        (4)   Fourth, allowed unsecured claims for contributions to an employee benefit plan —

              (A)   arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first . . . .

11 U.S.C. § 507(a)(4).[5] On June 12, 2003, Howard filed an objection

---

[3]Zurich filed another claim in Howard's bankruptcy proceeding on May 9, 2002 — an unliquidated, unsecured, and nonpriority claim — which is not relevant to this appeal.

[4]The amount of the Zurich Claim is premised on an actuarial analysis of Zurich's exposure to liability for claims incurred while the Policy was in effect. The Zurich Claim was admittedly slightly overstated, because it included a small amount owed under the automobile liability policy and covered a time period slightly in excess of 180 days.

[5]Creditors holding valid claims of fourth-level priority may recover from the general assets of a bankrupt's estate following, first, secured creditors, and second, unsecured creditors with claims qualifying under the first three levels of priority established by § 507(a). *See In re: Federal's Inc.*, 553 F.2d 509, 518 (6th Cir. 1977). The first three levels of priority are: (1) administrative expenses and fees of the estate, (2) claims arising from the ordinary course of business, and (3) wages and salaries up to $4,925. *See* 11 U.S.C. § 507(a)(1)-(9) (creating nine priority levels).

to the amount of the Zurich Claim, and specifically to Zurich's assertion that the Claim was entitled to priority status.

By an opinion filed on July 15, 2003, the bankruptcy court denied the Zurich Claim priority status, concluding that unpaid workers' compensation premiums are not "bargained-for, wage-substitute-type benefits," relying on materials it identified in the legislative history of the Statute. *In re: Howard Delivery Serv., Inc.*, BK No. 02-30289, at *5 (Bankr. N.D. W. Va.) (the "Bankruptcy Opinion") (observing also that three courts of appeals had so ruled while only one had determined otherwise). Zurich appealed the Bankruptcy Opinion to the district court, which affirmed, on December 22, 2003, on similar grounds. *Howard Delivery Serv., Inc. v. Zurich Am. Home Ins. Co. (In re: Howard Delivery Serv., Inc.)*, No. 3:03CV61, at *11 (N.D. W. VA.) (the "District Opinion"). Zurich has now appealed to this Court, contending that the Zurich Claim is entitled to priority status because the unpaid insurance premiums embodied therein constitute "contributions to an employee benefit plan arising from services rendered" under the Statute. We possess jurisdiction to consider Zurich's appeal because, in these circumstances, the District Opinion and the corresponding Judgment in a Civil Case, filed on December 22, 2003, constitute a final decision of the district court under 28 U.S.C. § 158(d).[6]

---

[6]Subsection (d) of § 158 provides jurisdiction in the courts of appeals "from all final decisions, judgments, orders, and decrees [by a district court] entered under subsection (a)." It is generally acknowledged that the "finality" requirement of § 158(d) is to be interpreted in light of the special circumstances of bankruptcy proceedings. *See Comm. of Dalkan Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 241 (4th Cir. 1987). And, as explained by Justice Breyer (then serving on the First Circuit) in a seminal decision on § 158(d) jurisdictional issues, *In re: Saco Local Development Corp.*, a district court's ruling in a priority dispute is typically an appealable ruling. 711 F.2d 441, 445 (1st Cir. 1983) ("[A] 'final judgment, order, or decree' . . . includes an order that conclusively determines a separable dispute over a creditor's claim or *priority*.") (emphasis added).

The district court's ruling that the Zurich Claim was not entitled to priority effectively concluded the dispute between Zurich and Howard because the Zurich Claim was then rendered valueless. If the Zurich Claim is not now accorded priority status, Zurich becomes another general unsecured creditor of Howard, and it is agreed that Zurich would then receive nothing from Howard's bankrupt estate. Furthermore, if it loses this appeal, Zurich has agreed to withdraw the Zurich Claim.

## II.

Zurich's appeal concerns the meaning and application of the Statute, which constitutes a question of law that we review de novo. *See Loudon Leasing Dev. Co. v. Ford Motor Credit Co.*, 128 F.3d 203, 206 (4th Cir. 1997). In construing the meaning of a statutory provision, we are obliged to utilize the well-settled two-step process explained in a long series of decisions, including *Newport News Shipbuilding & Dry Dock Co. v. Brown.* 376 F.3d 245, 248 (4th Cir. 2004). First, we must ascertain whether the language of the statutory provision is plain or ambiguous. If the provision is drawn in plain and unambiguous terms, we simply apply the statute's plain meaning. Alternatively, if the language of the statutory provision is ambiguous, we proceed to the second step in the process and seek to ascertain the meaning intended by Congress when the provision was enacted. In the context of the Bankruptcy Code, it is presumed that a debtor's resources should be equally distributed among the creditors, and statutory priorities are therefore to be narrowly construed. *See In re: Merry-Go-Round Enter., Inc.*, 180 F.3d 149, 157 (4th Cir. 1999) (observing general "presumption in bankruptcy cases that all of a debtor's limited resources will be equally distributed among creditors").

## III.

In assessing whether the Zurich Claim is entitled to priority status under the Statute, I first briefly review the split of authority in the federal courts as to whether claims for unpaid insurance premiums are so entitled. As explained below, I am of the view that the pertinent statutory terms — "contributions," "employee benefit plan," and "services rendered" — are plain and unambiguous. I am therefore obliged to apply the Statute to the Zurich Claim and, in so doing, conclude that it is entitled to priority status thereunder.

## A.

The issue presented by Zurich has been previously considered by several other courts, and they disagree on whether a debtor's unpaid premiums for workers' compensation insurance constitute "contributions to an employee benefit plan arising from services rendered," and

on whether a bankruptcy claim for such premiums is thereby entitled to fourth-level priority status under the Statute. *Compare Travelers Prop. Cas. Corp. v. Birmingham-Nashville Express, Inc. (In re: Birmingham-Nashville Express, Inc.)*, 224 F.3d 511 (6th Cir. 2000) (denying priority status), *State Ins. Fund v. S. Star Foods, Inc. (In re: S. Star Foods, Inc.)*, 144 F.3d 712 (10th Cir. 1998) (same), *and Employers Ins. of Wausau, Inc. v. HLM Corp. (In re: HLM Corp.)*, 62 F.3d 224 (8th Cir. 1995) (same), *with Employers Ins. of Wausau v. Plaid Pantries, Inc.*, 10 F.3d 605 (9th Cir. 1993) (affording priority status). This disagreement among the courts rests upon opposing constructions of the Statute: the Ninth Circuit (and various district and bankruptcy courts) deeming the Statute to be unambiguous and affording priority to such claims; while the Sixth, Tenth, and Eighth Circuits (as well as several district and bankruptcy courts) have concluded that the Statute's legislative history precludes priority status being accorded to such claims. These divergent views deserve some further examination.

1.

The first line of decisions addressing bankruptcy claims for unpaid insurance premiums, including the Ninth Circuit's decision in *Plaid Pantries*, has found the Statute to be unambiguous, and thus reasoned that legislative history need not be considered. Relying on the Statute's plain meaning, those courts have concluded that the Statute accords priority status to such claims as "contributions to an employee benefit plan arising from services rendered" under the Statute. *See Plaid Pantries*, 10 F.3d at 607 (according priority status to claim for unpaid workers' compensation premiums); *Saco*, 711 F.3d at 449 (according priority status to claim for unpaid employee group life, health, and disability insurance premiums); *Ivey v. Great W. Life & Annuity Ins. Co.*, 308 B.R. 752 (M.D.N.C. 2004), *appeal docketed*, No. 04-1576 (4th Cir. 2004) (according priority status to claim for unpaid health insurance premiums); *Principal Mut. Life Ins. Co. v. Joint Comm. of Unsecured Creditors (In re: CirrusCorp)*, 196 B.R. 76 (S.D. Tex. 1996) (same); *Allegheny Int'l, Inc. v. Metro. Life Ins. Co.*, 145 B.R. 820 (W.D. Pa. 1992) (according priority status to claim for unpaid life insurance premiums); *Official Labor Creditors Comm. v. Jet Fla. Sys., Inc. (In re: Jet Fla. Sys., Inc.)*, 80 B.R. 544 (S.D. Fla. 1987) (according priority status to claim for unpaid reimbursements

for covered medical expenses); *In re: Integrated Health Servs., Inc.*, 291 B.R. 611 (Bankr. D. Del. 2003) (according priority status to claim for unpaid workers' compensation insurance premiums); *In re: A.B.C. Fabrics of Tampa, Inc.*, 259 B.R. 759 (Bankr. M.D. Fla. 2001) (according priority status to claim for unpaid reimbursements for covered medical expenses); *In re: Braniff, Inc.*, 218 B.R. 628 (Bankr. M.D. Fla. 1998) (according priority status to claim for unpaid health and life insurance premiums); *Official Creditors' Comm. of Lummus Indus., Inc. v. Blue Cross & Blue Shield of Ga., Inc. (In re: Lummus Indus., Inc.)*, 193 B.R. 615 (Bankr. M.D. Ga. 1996) (according priority status to claim for unpaid health insurance premiums); *see also Perlstein v. Rockwood Ins. Co. (In re: AOV Indus., Inc.)*, 85 B.R. 183 (Bankr. D.D.C. 1988) (noting, albeit in dicta, that unpaid workers' compensation premiums are entitled to priority status).

In this series of decisions, the courts that have assessed the priority status of claims premised on unpaid workers' compensation premiums have found such claims to be indistinguishable from claims of priority status involving other types of employer-provided insurance benefits, *e.g.*, health, disability, or life insurance. *See Plaid Pantries*, 10 F.3d at 607; *Integrated Health Servs.*, 291 B.R. at 613. Indeed, the Statute fails to distinguish between an "employee benefit plan" that an employer is statutorily required to provide to its employees, *i.e.*, workers' compensation, and a benefit plan that an employer voluntarily decides to provide. The courts adopting the plain meaning view of the Statute have thus concluded that bankruptcy claims for unpaid workers' compensation premiums, like those for unpaid health, disability, and life insurance premiums, are entitled to priority status under the Statute.

2.

On the other hand, three of our sister circuits, as well as several of the lower courts, have turned to and relied on aspects of the Statute's legislative history in concluding that claims for unpaid workers' compensation premiums are somehow different from claims for premiums to voluntarily provided benefit plans, and that claims for unpaid workers' compensation premiums are not entitled to priority status as "contributions to an employee benefit plan" under the Statute. *See Birmingham-Nashville*, 224 F.3d at 517 (holding unpaid workers'

compensation premiums are not entitled to priority status); *S. Star Foods*, 144 F.3d at 715-17 (same); *HLM Corp.*, 62 F.3d at 225 (same); *In re: Allentown Moving & Storage*, 214 B.R. 761 (E.D. Pa. 1997) (same); *Edward W. Minte Co. v. Franey & Parr (In re: Edward W. Minte Co.)*, 286 B.R. 1, 8-13 (Bankr. D.D.C. 2002) (same); *In re: Perk Dev. Corp. Brambury Assocs.*, 246 B.R. 753 (Bankr. W.D.N.Y. 2000) (same); *In re: Arrow Carrier Corp.*, 154 B.R. 642 (Bankr. D.N.J. 1993) (same); *see also In re: Aer-Aerotron, Inc.*, 182 B.R. 725 (Bankr. E.D.N.C. 1995) (denying priority status to claim for unpaid life insurance premiums).

Congress enacted the Statute in 1978 in an effort to abrogate two Supreme Court decisions which had construed the terms "wages" and "commissions" of the priority provision of the predecessor statute, the Bankruptcy Act of 1898. *Joint Indus. Bd. of Elec. Indus. v. United States*, 391 U.S. 224 (1968); *United States v. Embassy Rest., Inc.*, 359 U.S. 29 (1959). In those decisions, the Court had held that the wage priority provision of the 1898 Act failed to afford priority status to claims for contributions to bargained-for, union-operated welfare and annuity funds. *Joint Indus.*, 39 U.S. at 228; *Embassy Rest.*, 359 U.S. at 33. Congress, in enacting the Statute, sought to ensure that the employees of bankrupt employers received priority on claims not just for their wages, but also for wage substitutes provided through "employee benefit plan[s]". *S. Star Foods*, 144 F.3d at 715-16 (relying on H.R. Rep. No. 95-595, at 187, 357 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6313 and S. Rep. No. 95-989, at 69 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5855)).

The line of decisions relying on the Statute's legislative history have generally concluded that a workers' compensation plan does not constitute a wage substitute and is not an "employee benefit plan" under the Statute, because workers' compensation is statutorily mandated.[7] *See HLM Corp.*, 62 F.3d at 225; *S. Star Foods*, 144 F.3d at

---

[7]None of the decisions taking this view has held that an "employee benefit plan" under the Statute must have resulted from collective bargaining. Indeed, the Sixth Circuit specifically rejected such an assertion, agreeing with the First Circuit's decision in *Saco*, stating: "we do not hold that to qualify for priority under § 507(a)(4) the wage substitute must actually be the product of collective bargaining." *Birmingham-Nashville*, 224 F.3d at 517 (relying on *Saco*, 711 F.3d at 449).

715; *Birmingham-Nashville*, 224 F.3d at 517. For example, the Sixth Circuit observed that: "[w]orkers' compensation is not a wage substitute; rather, it is an award arising out of a work-related injury *owed* by an employer." *Birmingham-Nashville*, 224 F.3d at 517 (emphasis added). More specifically, because workers' compensation coverage is statutorily mandated, an employer cannot offer its employees higher wages as a substitute for those benefits. *HLM Corp.*, 62 F.3d at 226. Because employees are, in that circumstance, entitled to workers' compensation benefits under law, the Eighth Circuit observed that, "even if the employer were illegally uninsured, the employers' participation in a workers' compensation insurance fund cannot be understood as a true benefit." *Id.*

B.

In order to ascertain which of these competing views to adopt, I must, pursuant to the applicable principles of statutory construction, first decide whether the Statute has a plain and unambiguous meaning. *Newport News Shipbldg.*, 376 F.3d at 248; *see Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 7 (2000) (admonishing that "when the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms") (citations omitted). In enacting the Statute, Congress failed to define the terms "contributions," "employee benefit plan," or "services rendered," as they are used therein, nor has the Supreme Court construed those terms. Where, as here, a statutory provision fails to expressly define the terms to be assessed, we are obliged to construe them in accordance with their ordinary or natural meaning. *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

In these circumstances, in order to ascertain whether the Statute is plain or ambiguous, I will assess separately the ordinary and natural meanings of the pertinent statutory terms, *i.e.*, "contributions," "employee benefit plan," and "services rendered." As explained below, although I am sensitive to the principle that bankruptcy priorities are to be interpreted narrowly, *see In re: Merry-Go-Round Enter., Inc.*, 180 F.3d 149, 157 (4th Cir. 1999), each of those terms is plain and unambiguous, and the Zurich Claim is therefore entitled to priority status under the Statute.

1.

First of all, an accepted and ordinary meaning of the term "contributions" is that they include sums "paid by an employer to [a] group-insurance fund . . . for employees." *Webster's Third New International Dictionary* 496 (reprint 1993) (1981). Importantly, a contribution need not be a payment that is voluntarily made. *Birmingham-Nashville*, 224 F.3d at 516 (observing that "employer's statutorily mandated payment to an employee benefit plan . . . is no less of a 'contribution' to such a fund simply because it is mandated by statute"). Applying this meaning of the term "contributions" to these circumstances, Howard's unpaid premiums on the Policy constitute sums to be paid by an employer to a group insurance fund for workers' compensation insurance, and constitute "contributions" within the meaning of the Statute.[8]

2.

Second, the insurance coverage provided by the Policy for Howard's workers' compensation liabilities constitutes an "employee benefit plan" as that term is used in the Statute. As explained below, I reach this conclusion because a workers' compensation plan constitutes an "employee benefit plan" under the Statute, and because the

---

[8]In concluding that the unpaid insurance premiums owed to Zurich are contributions, I necessarily reject the view that a contribution does not include the unilateral purchase of such a product or service, because a contribution, as defined by *Random House*, means *inter alia*, giving "*along with others*." *Birmingham-Nashville*, 224 F.3d at 515 (quoting *Random House Dictionary of the English Language* 308 (1981) (emphasis added)). Because the bankrupt employer in the *Birmingham-Nashville* proceeding was, like Howard, the sole purchaser of an insurance policy, its unpaid premiums were deemed not to constitute contributions. *Id.* I see this as an overly narrow interpretation of the term "contributions," precluding the existence of a sole contributor and denying priority status to claims for unpaid life, health, and disability insurance premiums. Claims for such unpaid insurance premiums have been accorded priority status by the First Circuit in *Saco*, and by multiple district and bankruptcy courts. *See Saco*, 711 F.2d at 441; *see also supra* Part III.A.1.

insurance coverage purchased by an employer to cover such a plan is also an "employee benefit plan."[9]

a.

A workers' compensation insurance program constitutes a detailed contractual arrangement enabling an employer to provide health, disability, lost-wage, and death benefits to employees who are injured in the course of their employment. As the bankruptcy and district courts recognized in this case, the benefits of workers' compensation coverage plainly inure to those employees who receive payments thereunder. *See* Bankruptcy Opinion at *5 (workers' compensation is "unarguably a benefit for employees"); District Opinion at *11 (workers' compensation is "of great benefit to employees"). Next, a "benefit" is, *inter alia*, "a cash payment provided for under an . . . insurance plan," or "financial help in time of sickness, old age, or unemployment." *Webster's Third* 204. Under West Virginia workers' compensation law, employees receive benefits from an insurance plan, such as that provided by the Policy, to assist them when work-related injuries result in sickness or unemployment. *See Repass v. Workers' Comp. Division*, 569 S.E.2d 162, 168-69 (W. Va. 2002) ("The Act is designed to compensate injured workers . . . in order that injured workers and those who depend upon them for support shall not be left destitute during a period of disability."). Finally, a "plan" constitutes, *inter alia*, "a detailed and systematic formulation of a large-scale campaign or program of action." *Webster's Third* 1729. Applying that

---

[9]Certain bankruptcy courts have found the ERISA definition of "employee benefit plan" to be useful in construing the meaning of the Statute, because, under ERISA, workers' compensation is identified as an "employee benefit plan." *See* 29 U.S.C. §§ 1002(1)-(3), 1003(b); *see, e.g.*, *Allegheny Int'l, Inc. v. Metro. Life Ins. Co. (In re: Allegheny Int'l, Inc.)*, 138 B.R. 171, 173-74 (Bankr. W.D. Pa. 1992), *aff'd*, 145 B.R. 820 (W.D. Pa. 1992). However, "[m]ost federal courts . . . have rejected this reasoning." *Birmingham-Nashville*, 224 F.3d at 517. Importantly, the Supreme Court has held that, for purposes of construing terms found in the Bankruptcy Code, it is inappropriate to incorporate characterizations of a term in another statute absent some congressional indication that this was intended. *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 225 (1996). I therefore decline to rely upon the ERISA definition.

definition, workers' compensation insurance, as a detailed arrangement between employees and employers, readily constitutes such a "plan." Workers' compensation insurance is thus an "employee benefit plan" within the plain meaning of that statutory term.

I acknowledge, and respectfully so, that three of the four courts of appeals to face this question have disagreed, taking the view that workers' compensation insurance coverage does not constitute an "employee benefit plan." We are unable to decide such an issue by a poll of the courts, however, and I view the contrary reasoning of those courts as unpersuasive. *See McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004) (en banc) (Luttig, J., dissenting) ("Judicial interpretation is not an exercise in poll-taking.") The courts adopting the contrary view have relied on aspects of the Statute's legislative history to interpret the term "employee benefit plan," and they have consistently done so without first deciding that the statutory term is ambiguous. Indeed, the Eighth Circuit concluded that the plain meaning of the term "employee benefit plan" militated against affording priority based upon the legislative history of the Statute. *HLM Corp.*, 62 F.3d at 225 (observing that since Bankruptcy Code did not define term, "the legislative history is instructive and illuminating" without addressing term's plain meaning). The Tenth Circuit simply concluded that a split in the circuits was sufficient evidence that the statutory provision was ambiguous. *S. Star Foods*, 144 F.3d at 715 ("The split in the circuits is, in itself, evidence of the ambiguity of the phrase 'contributions to an employee benefit plan' . . . .").[10] And the Sixth Circuit reasoned that the term "employee benefit plan" is ambiguous by first looking, inappropriately, to the Statute's legislative history. *Birmingham-Nashville*, 224 F.3d at 517 (holding that "it is not at all clear" what "employee benefit plan" means and citing *Embassy Restaurant* decision for authority that term is limited to "wage substitutes," without addressing plain meaning). In our view, these decisions fail to heed the Court's admonishment that "when the [Bankruptcy Code's] language is plain, the sole function of the courts

---

[10]I see this point as unpersuasive. As Justice Thomas has aptly observed, "[a] mere disagreement among litigants over the meaning of a statute does not itself prove ambiguity; it usually means that one of the litigants is simply wrong." *Bank of A. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 461 (1991) (Thomas, J., concurring).

— at least where the disposition required by the text is not absurd — is to enforce it according to its terms." *Hartford Underwriters*, 530 U.S. at 7 (citations omitted).

The language of the Statute is plain and unambiguous — it does not require that compensation received by an employee be a "wage substitute," nor does it exclude an employee benefit plan that is statutorily mandated.[11] Put simply, we are not entitled to require an employee benefit plan to qualify as a wage substitute or to require that participation in such a plan be voluntary, thereby engrafting limitations on statutory provisions in order to "achieve that which Congress is perceived to have failed to do." *United States v. Locke*, 471 U.S. 84, 95 (1985); *see also Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 126 (1989) ("our task is to apply the text, not improve on it"). In sum, the plain language of the Statute accords priority to contributions made to an "employee benefit plan" and, applying the relevant statutory provisions, workers' compensation insurance coverage constitutes such a plan.

b.

Turning next to the question of whether this particular Policy constitutes an "employee benefit plan," within the meaning of the Statute, I conclude that it does. The Policy constitutes such a "plan," in that it is a "detailed and systematic formulation of a large-scale . . . program of action." *Webster's Third* 1729. The district court concluded otherwise, finding that the Policy failed to benefit Howard's employees, and that it benefitted Howard only, because "the insurance is designed to shield Howard from the liability of providing workers' compensation benefits." District Opinion at *10.

Notwithstanding the benefits accruing to Howard under the Policy, the insurance coverage provided thereunder plainly inured to the benefit of Howard's employees. Zurich was obliged to pay Howard's workers' compensation claims and be partially reimbursed by Howard

---

[11]*See also In re: Integrated Health Servs., Inc.*, 291 B.R. 611 (Bankr. D. Del. 2003) (making comprehensive analysis of statute and pertinent legislative history, and according priority status to claim for unpaid workers' compensation insurance premiums).

pursuant to the Policy's provisions. As a result, the Policy directly benefitted the Howard employees who received compensation. *See Ivey v. Great W. Life & Annuity Ins. Co. (In re: Ivey)*, 308 B.R. 752, 757 (M.D.N.C. 2004) ("the plain language of the statute . . . include[s] priority for an insurance company which has expended its own funds to make the plan work"). That the Policy may also have benefitted Howard is not controlling, because it unquestionably provided an "employee benefit" under the plain and unambiguous meaning of that term.

Nearly all the courts addressing the issue have ruled that claims for unpaid health, disability, and life insurance premiums are entitled to priority status under the Statute, and that those types of insurance constitute a benefit to employees.[12] *See supra* Part III.A.1. And of import here, the coverage provided by workers' compensation insurance is indistinguishable, under the Statute, from those other types of insurance. As Justice Breyer aptly observed in *Saco*: "[t]o allow the insurer to obtain its premiums through priority would seem the surest way to provide employees with the policy benefits to which they are entitled." 711 F.2d at 449. As with health, disability, and life insurance, workers' compensation coverage conveys a benefit to employees, and the Zurich Claim arises from an "employee benefit plan."

3.

Finally, Howard asserts that the meaning of the term "services rendered," as found in the Statute, is limited to those services rendered by its employees and does not include services rendered by an insurer such as Zurich. *See Edward W. Minte Co. v. Franey & Parr (In re:*

---

[12]In resolving this issue I am impressed with the reasoning of the recent decision of the Middle District of North Carolina on the question of whether a claim for unpaid insurance premiums is entitled to priority status. *Ivey*, 308 B.R. at 755-57. That court makes a comprehensive analysis of this issue, concluding that such a claim is entitled to priority status under the Statute. *Id.* at 756 (observing that statutory language "appears to allow priority for insurers or any other parties who make contributions to the plan"). Because the court deemed the "plain language" of the Statute to be unambiguous, it had no reason to "look beyond the text of the statute to the legislative history." *Id.* at 757.

*Edward W. Minte Co.*), 286 B.R. 1, 8-13 (Bankr. D.D.C. 2002).[13] It contends that, because the Zurich Claim arises from the provision of insurance coverage by Zurich, rather than from services rendered by Howard's employees, the Claim does not fall within the plain meaning of "services rendered" under the Statute. *Id.*

I reject Howard's contention on this point because it seeks to inappropriately limit the breadth of the relevant term. I am again content to follow Justice Breyer's guidance in *Saco* that insurers may be entitled to priority under the Statute. 711 F.2d at 449. Regardless of whether the term "services rendered" refers to the provision of insurance or is limited to employees' services, the Zurich Claim satisfies this aspect of the Statute. It is only because workers were employed by Howard (and providing services to it) prior to the bankruptcy filing that Howard's obligation to provide insurance and pay the necessary premiums arises. The Zurich Claim thus arises from "services rendered" by Howard's employees, *i.e.*, their services occasioned Howard's obligation to purchase workers' compensation insurance, and by Zurich as well, *i.e.*, providing insurance.[14]

## IV.

Pursuant to the foregoing, the Zurich Claim is entitled to priority under the Statute. I therefore concur in the judgment to reverse the decision of the district court and remand for such further proceedings as may be appropriate.

---

[13]Under the *Minte* decision, on which Howard relies for this contention, only employees or administrators of employee benefit plans who represent employee interests may recover under the Statute. 286 B.R. at 10.

[14]Because the language of the Statute is plain and unambiguous, I decline Howard's invitation to examine its legislative history. Conducting such an analysis "would require a radical abandonment of our long-standing precedents that permit resort to legislative history only when necessary to interpret ambiguous statutory text." *Bedroc Ltd., LLC v. United States*, 541 U.S. 176, 124 S.Ct. 1587, 1595 (2004).

SHEDD, Circuit Judge, concurring:

While I appreciate Judge King's well-crafted opinion and concur in its result, I base my opinion on a different rationale. Our paths diverge on the issue of whether the phrase "employee benefit plan" in § 507(a)(4) is ambiguous. Judge King finds the individual words of this phrase to be unambiguous, but I find the phrase as a whole to be ambiguous. In ascertaining the meaning of this ambiguous phrase, I rely on specific evidence in the statute's legislative history showing that Congress likely intended to import the definition of the term "employee benefit plan" from ERISA to this particular bankruptcy priority provision. Under ERISA, "employee benefit plan" includes workers' compensation benefit plans. Thus, when Congress enacted § 507(a)(4), it granted priority protection to contributions to workers' compensation plans.

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (holding that the term "employee" in Title VII is ambiguous in its context). In determining whether a statute is plain or ambiguous, a court must consider the specific language employed, the specific context of that language, and the broader context of the statute as a whole. *Id.* at 341. A statute is ambiguous if its language is susceptible to more than one reasonable interpretation. *Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir. 2004). "If the statutory language is clear and unambiguous, our inquiry ends there." *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996). If, however, a statute is ambiguous, resort to legislative history is appropriate. *Bedroc Ltd. v. United States*, 541 U.S. 176, ___, 124 S.Ct. 1587, 1595 (2004).

In deciding that § 507(a)(4) is unambiguous, Judge King picks and chooses from accepted dictionary definitions of the words "benefit" and "plan" and concludes that an "employee benefit plan" is any "cash payment provided for under an . . . insurance plan" or "financial help in time of sickness, old age, or unemployment" to an employee that is paid according to "a detailed and systematic formulation of a large-scale campaign or program of action." Although this definition might be one reasonable interpretation of these words, it is not the *only* rea-

sonable interpretation. For instance, in common usage the phrase "employee benefit plan" can refer to a package of "fringe benefits," which may or may not include workers' compensation benefits. *See, e.g.*, 29 C.F.R. § 1625.10(b) (2005) (stating that, for purposes of the Age Discrimination in Employment Act, an "employee benefit plan" is a plan that "provides employees with what are frequently referred to as 'fringe benefits'"); *Employee Fringe Benefits: Tax Policy Issues*, Management Matters, Sept. 1, 1992 (listing the four most common "fringe benefits" as pensions, health insurance, life insurance, and flexible benefit programs). Moreover, the context of the statute suggests that Congress could have intended the phrase "employee benefit plan" to be a term of art having a specific meaning different from the sum of what these three words mean individually. Accordingly, because the term "employee benefit plan" is susceptible to more than one reasonable interpretation, it is appropriate to consider the legislative history of § 507(a)(4) to determine what Congress intended by using this particular language. *See Bedroc*, 124 S. Ct. at 1595.

As originally introduced in 1975, the new priority for "employee benefit plans" included "allowed claims for contributions to *pension, insurance, or similar employee benefit plans* . . . ." H.R. 31, 94th Congress (1975) (emphasis added). In hearings before the Judiciary Committee of the United States House of Representatives, one important witness — a union official representing more than a dozen affiliated unions and several million tradesmen — suggested that the legislation could be interpreted too narrowly and should therefore be amended "so as not inadvertently to exclude certain other types of plans." Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong. 2452 (1976). To broaden the coverage of the priority, this witness urged Congress to delete the words "pension, insurance, or similar" and instead parallel the language of ERISA. *Id.* Thus, "[t]he contributions for which priority treatment should be granted should be any contributions to an employee benefit plan as defined in *ERISA § 3(3)*." *Id.* at 2455. (emphasis added).

The priority was enacted into law two years later as part of the Bankruptcy Reform Act of 1978, Pub. L. 95-598, 92 Stat. 2549 (codified at 11 U.S.C. § 507(a)(4)). Congress enacted the exact wording

proposed in the House Judiciary Committee hearing two years earlier, so that the priority applies to "allowed unsecured claims for contributions to an employee benefit plan." 11 U.S.C. § 507(a)(4).

In this particular instance, the best evidence as to what Congress intended by incorporating the term "employee benefit plan" comes not from attempting to ascertain the overriding purposes and aims of the legislation.[1] Instead, we have a direct indication from the legislative history that Congress intended to give this particular term the same meaning that it had given to that same term just four years earlier when it enacted ERISA. *See* Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829. Accordingly, I conclude that Congress intended the phrase "employee benefit plan" in the bankruptcy priority provision to have the same meaning that it has in ERISA.[2]

ERISA § 3(3) defines the term "employee benefit plan" to mean "an *employee welfare benefit plan* or an employee pension benefit

---

[1]I note, however, that my approach is also consistent with the Congressional purpose and aim of the legislation. Language in the House Committee Report explaining the purpose of the new priority provision suggests that workers' compensation plans are entitled to priority. That Report states that the new priority will cover contributions and payments to plans including "health insurance programs, life insurance plans, pension funds, and all other forms of employee compensation that is not in the form of wages." H.R. Rep. No. 95-595, at 6148 (1977). Under this very broad language, workers' compensation would qualify as "employee compensation that is not in the form of wages."

[2]Relying on *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213 (1996), Judge King rejects the ERISA definition because it is "inappropriate to incorporate characterizations of a term in another statute absent some congressional indication that this was intended." This contention ignores the indication of Congress's intent in the legislative history. The plain facts that (1) Congress was urged to make § 507(a)(4) consistent with ERISA and (2) Congress subsequently amended the provision to employ the very same term that is used in ERISA provides "some congressional indication" that "employee benefit plan" should have the same meaning in both statutes. Simply, Congress used a special term it had used in the recent past with knowledge of what that term meant.

plan . . . ." 29 U.S.C. § 1002(3) (emphasis added). An "employee welfare benefit plan" is:

> any plan, fund, or program . . . established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . .

29 U.S.C. § 1002(1). Based on these definitions, the workers' compensation insurance plan at issue in this case qualifies as an "employee benefit plan." The plan at issue was established by Howard Delivery Service through the purchase of insurance and was maintained for the purpose of providing benefits in the event of sickness, accident, disability or death of the employees.[3]

Because Congress enacted an ambiguous statute, we must ascertain from the statute's legislative history which types of plans Congress meant to include in this new bankruptcy priority. In my view, the best evidence reveals that Congress intended the term "employee benefit

---

[3]ERISA § 4(b)(3) further confirms that the term "employee benefit plan" includes workers' compensation plans. This code section provides:

> (b)   The provisions of this subchapter shall not apply to any *employee benefit plan* if—
>
> . . .
>
>> (3)   *such plan* is maintained *solely* for the purpose of complying with applicable *workmen's compensation* laws . . . .

29 U.S.C. § 1003(b)(3) (emphasis added). In other words, all workers' compensation plans are "employee benefit plans" under ERISA's definition, but ERISA does not govern all "employee benefit plans," including some workers' compensation plans. *See PPG Indus. Pension Plan v. Crews*, 902 F.2d 1148, 1151 (4th Cir. 1990) (deciding that ERISA applies to company's employee benefit plan providing workers' compensation benefits because it was not maintained solely for the purpose of complying with West Virginia's workers' compensation laws).

plan" in § 507 (a)(4) to share the same meaning as "employee benefit plan" under ERISA. A workers' compensation insurance plan is an "employee benefit plan" under ERISA, and it necessarily follows that a workers' compensation plan qualifies as an "employee benefit plan" under § 507 (a)(4) of the Bankruptcy Code. Accordingly, I concur with Judge King that the Zurich Claim is entitled to priority and that the judgment of the district court should be reversed.

NIEMEYER, Circuit Judge, dissenting:

The sole question in this appeal is whether the claim of Zurich American Insurance Company filed against the estate of Howard Delivery Service, Inc., the debtor in bankruptcy, for unpaid workers' compensation insurance premiums is given priority by § 507(a)(4) of the Bankruptcy Code. Because such premiums are plainly not — as the statute requires they must be — "contributions to an employee benefit plan arising from services rendered," 11 U.S.C. § 507(a)(4), I would affirm the judgment of the district court denying priority for Zurich's claim.

In holding that claims for unpaid workers' compensation insurance premiums enjoy the same priority as claims for unpaid employee fringe benefits, the judgment of the majority widens a split among the circuits, joining the Ninth Circuit as the only circuit that has so held. *See Employers Ins. of Wausau v. Plaid Pantries, Inc.*, 10 F.3d 605 (9th Cir. 1993). The other three circuits that have considered this issue have held that claims for unpaid workers' compensation insurance premiums do not fall within the statutory language of § 507(a)(4) and therefore do not enjoy the priority afforded by that section. *See Travelers Prop. Cas. Corp. v. Birmingham-Nashville Express, Inc. (In re: Birmingham-Nashville Express, Inc.)*, 224 F.3d 511 (6th Cir. 2000); *State Ins. Fund v. Southern Star Foods, Inc. (In re: Southern Star Foods, Inc.)*, 144 F.3d 712 (10th Cir. 1998); *Employers Ins. of Wausau, Inc. v. HLM Corp. (In re: HLM Corp.)*, 62 F.3d 224 (8th Cir. 1995). Because I believe that the decisions of these three circuits better capture the plain meaning of § 507(a)(4), I would join them.

I

When construing a statutory provision, we begin with an analysis of the statute's language. *See, e.g.*, *Landreth Timber Co. v. Landreth*,

471 U.S. 681, 685 (1985). If the language is unambiguous and "the statutory scheme is coherent and consistent," we apply the statute as written. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enterprises*, 489 U.S. 235, 240 (1989)) (internal quotation marks omitted). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." 519 U.S. at 341.

Moreover, in construing provisions of the Bankruptcy Code, we keep in mind its overriding objective of providing to creditors equal distribution of a debtor's limited resources. *See Isaac v. Temex Energy, Inc. (In re Amarex, Inc.)*, 853 F.2d 1526, 1530 (10th Cir. 1988). Because of this broad equitable purpose, statutory priorities must be narrowly construed. *See Travelers Prop. Cas. Corp.*, 224 F.3d at 517; *New Neighborhoods, Inc. v. W. Va. Workers' Comp. Fund*, 886 F.2d 714, 719 (4th Cir. 1989); *Isaac*, 853 F.2d at 1530. Stating this principle as a rule of statutory construction, the claims of a class of creditors may receive preferential or priority treatment from bankruptcy courts *only* when authorized by Congress in clear and unequivocal terms. *See United States v. Embassy Restaurant, Inc.*, 359 U.S. 29, 31, 33 (1959). It follows that if a particular type of unsecured claim is not clearly and unequivocally listed in 11 U.S.C. § 507(a), which enumerates the Bankruptcy Code's priorities, then Congress had no intention of giving the claim priority, *see Nathanson v. NLRB*, 344 U.S. 25, 29 (1952); *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106, 110 (6th Cir. 1987), and we would not be free to create a new priority, *see Caminetti v. United States*, 242 U.S. 470, 485 (1917).

II

In this case, we consider whether 11 U.S.C. § 507(a)(4) *clearly* grants priority to claims for unpaid workers' compensation insurance premiums. Before turning to the specific language of § 507(a)(4), it is useful to give context to the enactment of that section, *see Robinson*, 519 U.S. at 341, which in this case provides substantial assistance in understanding the statutory language employed by Congress.

Congress enacted § 507(a)(4) in 1978 specifically to overrule the holdings in two Supreme Court cases: *United States v. Embassy Res-*

*taurant, Inc.*, 359 U.S. 29 (1959), and *Joint Industry Board v. United States*, 391 U.S. 224 (1968). In *Embassy Restaurant*, the Court construed the predecessor to § 507(a), 11 U.S.C. § 104(a)(2) (repealed 1978), which established a priority in bankruptcy for claims of "wages . . . due to workmen," and held that a claim for contributions by an employer to a union welfare plan owed under the terms of a collective bargaining agreement did not constitute "wages . . . due to workmen." 359 U.S. at 30-31. Trustees of the welfare plan, which had been formed to maintain life insurance, weekly sick benefits, hospital benefits, and other advantages for union members, *id.* at 30, argued that "since unions bargain for these contributions as though they were wages and industry likewise considers them as an integral part of the wage package, they must in law be considered wages," *id.* at 33 (internal quotation marks omitted). Rejecting this argument, the Supreme Court held that fringe benefits payable through a plan "cannot be treated as being within the clear, unequivocal language of 'wages . . . due to workmen.'" *Id.*

Likewise, in *Joint Industry Board*, the Supreme Court, following its decision and rationale in *Embassy Restaurant*, held that a claim for an employer's unpaid contributions to an employees' annuity plan established by a collective bargaining agreement was not a claim for "wages . . . due to workmen" under 11 U.S.C. § 104(a)(2) (repealed 1978). *See* 391 U.S. at 226-28.

In response to these two decisions, Congress enacted § 507(a)(4) to give priority status to claims for such fringe benefits — the "contributions" to employee benefit plans referred to in *Embassy Restaurant* and *Joint Industry Board*. As Congress explained:

> Paragraph (4) overrules *United States v. Embassy Restaurant*, which held that fringe benefits were not entitled to wage priority status. The bill recognizes the realities of labor contract negotiations, under which wage demands are often reduced if adequate fringe benefits are substituted. The priority granted is limited to claims for contributions to employee benefit plans such as pension plans, health or life insurance plans, and others, arising from services rendered.

H.R. Rep. No. 95-595, at 357 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6313 (internal citation omitted). That purpose is now captured in the text of § 507(a)(4), which reads:

> (a)   The following expenses and claims have priority in the following order:
>
> *        *        *
>
> (4)   Fourth, allowed unsecured claims for contributions to an employee benefit plan arising from services rendered within 180 days [of the filing of a petition] . . . .

In this context, we now turn to the specific question of whether a claim for unpaid premiums for workers' compensation insurance is clearly and unequivocally a claim for "contributions to an employee benefit plan arising from services rendered."

### III

In defining the priority granted in § 507(a)(4), Congress used the language the Supreme Court used to describe fringe benefits in *Embassy Restaurant* when it excluded them from "wages . . . due to workmen." *See* 359 U.S. at 29-30 (framing the issue as "whether contributions to an employer welfare fund which are required by a collective bargaining agreement are entitled to priority"). Although Congress could have used broader terms in defining the priority, it selected the terms (1) "contributions" to an (2) "employee benefit plan," and related them to (3) "services rendered" by the employee. These three phrases taken together connote the very fringe benefits rejected in *Embassy Restaurant* and *Joint Industry Board*. Of course, this is not surprising, because 11 U.S.C. § 507(a)(4) was enacted specifically to overrule these two cases.

The question here is whether a claim for unpaid insurance premiums falls within the class of claims described by Congress as claims for unpaid "contributions to an employee benefit plan arising from services rendered." Stated more succinctly, is workers' compensation coverage a fringe benefit? Several compelling reasons convince me

that a claim for unpaid insurance premiums is quite distinct from unpaid "contributions to an employee benefit plan arising from services rendered" and thus is not accorded priority status under the statute.

*First*, workers' compensation liability is an *employer's* liability imposed by statute in lieu of tort liability. *See Mandolidis v. Elkins Indus., Inc.*, 246 S.E.2d 907, 911 (W. Va. 1978) (noting that West Virginia's "Workmen's Compensation Act was designed to remove negligently caused industrial accidents from the common law tort system") (emphasis omitted); *Belcher v. J. H. Fletcher & Co.*, 498 F. Supp. 629, 630-31 (S.D. W. Va. 1980) (same). Thus, rather than constituting the payment of a "benefit" to employees, insurance premiums for workers' compensation are the payments due from an employer in respect to its statutory *liability* and its employees' statutory *rights*. Such payments are not thought to be "contributions," a term that involves a notion of voluntariness. *See Webster's Third New International Dictionary* 496 (Merriam Webster Inc. ed., 1993) (defining a "contribution" as "a sum or thing voluntarily contributed"). Thus, while payments to a plan for fringe benefits are considered "contributions," payments made to discharge a statutorily mandated liability are not.

*Second*, the *payment of premiums* to an insurance company for the issuance of a workers' compensation insurance policy is not a contribution "to an employee benefit plan" as that term is used in the statute. Although it would be correct to categorize some employer-funded insurance policies as "employee benefit plans," that categorization is fitting only when the employer voluntarily provides the insurance policy as a fringe benefit to its employees or when the policy is negotiated between the employer and the employees as part of a collective bargaining agreement. A plan arrived at through those methods is quite different from a policy of insurance issued to discharge the statutorily mandated *liability* of an employer for workplace injuries.

*Third*, the payment of premiums by an employer to an insurance company for workers' compensation insurance coverage is not a surrogate for the payment of wages to employees, as is embraced by the notion of a fringe benefit. *See, e.g.*, *Embassy Restaurant*, 359 U.S. at 32-33. Section 507(a)(4) gives priority *only* to contributions that are

considered fringe benefits in the sense that they arise from the employees' "services rendered." The claim for an unpaid insurance premium is not a claim for a contribution arising from "services rendered." While premiums for workers' compensation insurance might be computed by considering the number of employees covered on any given day, the premium is not linked to the "services rendered" by the employees as is required to qualify for priority status under § 507(a)(4).

In short, the plain language of § 507(a)(4), which gives priority to claims for unpaid "contributions to an employee benefit plan arising from services rendered," does not cover claims for unpaid insurance premiums charged to cover the statutory liability of the employer to its employees. The unpaid insurance premium is not an unpaid *contribution*; it is not an unpaid contribution *to an employee benefit plan*; and it does not arise out of an employee's *services rendered* in that it is not a *wage surrogate*.

To read § 507(a)(4) as expansively as do the opinions of Judge King and Judge Shedd not only disregards the explicit language of the statute, but such a reading also violates the underlying ground rules for construing priorities under the Bankruptcy Code. "The broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate," and "if one claimant is to be preferred over others, the purpose should be clear from the statute." *Embassy Restaurant*, 359 U.S. at 31 (internal quotation marks and citation omitted); *see id.* at 33 (requiring a priority to be "within the clear, unequivocal language" of the statute). I submit it is not clear that § 507(a)(4) intends to give priority to claims for unpaid insurance premiums and therefore we are not free to create such a priority.

To make the construction advanced by his concurring opinion appear reasonable, Judge King has cobbled together selected dictionary definitions and portions of definitions. He has taken the statutory words out of context to stretch them beyond their plain meaning. This approach suffers, I respectfully submit, from the same flaw as does the indiscriminate use of statistics. But even when taking this approach — an approach that also violates the mandate to construe bankruptcy priorities narrowly — it is facially irrational to assert that payments for mandatory workers' compensation liability fall within

the *plain meaning* of the term "contributions to an employee benefit plan arising from services rendered."

Judge Shedd's opinion, concurring in the judgment, aptly notes that Judge King's opinion "picks and chooses from accepted dictionary definitions" to arrive at "one reasonable interpretation," but not "the *only* reasonable interpretation." But Judge Shedd's opinion then proceeds to construe "employee benefit plan" in § 507(a)(4) broadly, employing the definition given for that phrase in ERISA, 29 U.S.C. § 1002(3). Applying that definition out of context, Judge Shedd concludes that insurance for workers' compensation benefits is an "employee benefit plan" that enjoys priority under the Bankruptcy Code.

Judge Shedd's opinion well notes that ERISA explicitly exempts from its coverage any plan "maintained solely for the purpose of complying with applicable workmen's compensation laws." What Judge Shedd's opinion fails to address, however, is the analogous limitation made in the Bankruptcy Code. While § 507(a)(4) gives priority to claims made against the estate for "contributions to an employee benefit plan," that priority is *not* afforded with respect to every "employee benefit plan." The priority is extended only with respect to contributions to employee benefit plans "arising from services rendered." The phrase "arising from services rendered" indicates that not all employee benefit plans are given priority, but only those that function as wage surrogates. This is an especially important phrase in context because Congress enacted the priority to overrule the Supreme Court's earlier decisions in *Embassy Restaurant* and *Joint Industry Board*.

For the reasons given, I would join the three circuits that have construed § 507(a)(4) not to give priority to claims for unpaid workers' compensation insurance premiums, *see Travelers Prop. & Cas. Corp.*, 224 F.3d at 517; *State Ins. Fund*, 144 F.3d at 717; *Employers Ins. of Wausau*, 62 F.3d at 226-27, expressing regret that we are now widening the split among the circuits.